651 F.2d 1096
 1984 A.M.C. 1927
 GATOR MARINE SERVICE TOWING, INC., Plaintiff-Appellee Cross-Appellant,
v.
J. RAY McDERMOTT & CO., Defendant-Appellant Cross-Appellee.
ASSOCIATES COMMERCIAL CORP. OF DELAWARE, Plaintiff-Appellee,
v.
The OIL SCREW, "Terral Perry", et al., Defendants,
Raleigh J. PITRE, Intervenor-Appellee,
v.
J. RAY McDERMOTT & CO., Intervenor-Appellant.
 No. 80-3023.
 United States Court of Appeals,
Fifth Circuit.
 
 Unit A
 July 29, 1981.
 Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Ernest A. Carrere, Jr., Robert J. Oberfell, New Orleans, La., for defendant-appellant cross-appellee.
 Adams & Reese, George V. Baus, New Orleans, La., for Associates Commercial.
 James G. Burke, Jr., William B. Schwartz, New Orleans, La., for Gator Marine.
 Ralph D. Hillman, Thibodaux, La., for Pitre.
 Appeals from the United States District Court for the Eastern District of Louisiana.
 Before INGRAHAM, POLITZ and WILLIAMS, Circuit Judges.
 JERRE S. WILLIAMS, Circuit Judge:
 
 
 1
 This appeal arises from the consolidated bench trial of two lawsuits spawned by the sinking of the oil screw TERRAL PERRY, a Gator Marine tug that capsized in the Gulf of Mexico with McDermott cargo aboard. In one lawsuit, Gator Marine[1] and McDermott charge each other with responsibility for the negligence that caused this maritime casualty. In a second suit, Associates Commercial Corporation and Raleigh J. Pitre, as Gator Marine creditors holding mortgage liens against the TERRAL PERRY, vie with McDermott, as a tort lien creditor, for priority in the scramble for proceeds from a foreclosure sale of the salvaged tug.
 
 
 2
 The district court sorted through these conflicting contentions and determined that: (1) both McDermott and Gator Marine were negligent; (2) under maritime comparative fault principles, McDermott was 60% liable for Gator Marine's claim and Gator Marine was 40% liable for McDermott's; and (3) since McDermott's liability to Gator Marine far exceeded its right to recovery, its assertion of a tort lien against the foreclosure sale proceeds should be dismissed. The trial court entered judgment based on these findings and awarded prejudgment interest at the rate of 10% per year.
 
 
 3
 On appeal, McDermott challenges the trial court's apportionment of comparative fault and reasserts its claim to priority in the foreclosure sale proceeds. Gator Marine maintains that McDermott must bear the entire loss because, as a stevedore who breached its warranty of workmanlike performance, McDermott owes indemnity to Gator. Gator also argues that the rate of prejudgment interest set by the district court was too low. Associates Commercial Corporation contends that, even if McDermott's right to recover against Gator exceeded its liability, McDermott's asserted tort lien is precluded by laches. In response to each of these contentions on appeal, we affirm the judgment of the district court.
 
 
 4
 The TERRAL PERRY "Turns Turtle"
 
 
 5
 In the early morning hours of September 21, 1976 Raleigh J. Pitre, master of the TERRAL PERRY, received a telephone call from the McDermott offshore operations yard on Bayou Boeuf near Amelia, Louisiana. McDermott requested the TERRAL PERRY's services for a trip from the Bayou Boeuf facility to a McDermott drilling barge located off the Louisiana coast in the Gulf of Mexico. Prior to September 21, the TERRAL PERRY had frequently performed towing services for McDermott barges under a time charter agreement arranged through a boat broker. Testimony at trial indicated, however, that the tug had never before been employed under the charter agreement for the carriage of cargo.
 
 
 6
 Captain Pitre responded to McDermott's call by 6:00 a. m. on the 21st, arriving with his tug and three-man crew at the Bayou Boeuf dock. He was instructed by McDermott employees to back his vessel into slip number one. As Pitre stabilized the tug's position in the slip by backing his engines, McDermott employees proceeded to lower by crane a 15-ton spool of wire cable onto the TERRAL PERRY's stern deck. Prior to that moment, Captain Pitre testified at trial, he had no notice that McDermott wished to use the TERRAL PERRY for carriage of cargo. Pitre admitted that he did not inquire as to the weight of the spool or consider exercising his right as master of the vessel to decline the job.
 
 
 7
 The crane initially deposited the spool off-center on the stern deck, causing the tug to list noticeable and inspiring Pitre to request that the spool be repositioned. The McDermott employees honored his request and centered the spool on the stern deck. With the 15-ton cargo on board, the stern deck of the TERRAL PERRY rode approximately eight inches out of the water. The loading crew then secured the spool fore and aft with chains drawn through the spool's core and attached to towing bitts and a deck grading. The McDermott crew did not, however, secure the spool against movement from side-to-side, leaving it in an upright position resting on the rounded edges of its wooden sides. So loaded, the TERRAL PERRY was dispatched on its voyage to the Gulf.
 
 
 8
 The tug carried its cargo approximately 50 miles along Louisiana inland waterways, down the Atchafalaya River, and into three foot seas in the Gulf without incident. Then, approximately ten miles from the sea buoy marking the mouth of the Atchafalaya, the TERRAL PERRY took a sharp list to port. Captain Pitre, detecting no leakage in the bilges, checked the cargo on the stern deck. The cable spool, unrestrained from side-to-side movement, had shifted to port. With no equipment at the crew's disposal to correct the 15-ton spool's misalignment, the vessel's fate was sealed. Within a minute the TERRAL PERRY had rolled completely over, exposing the hull of the capsized oil screw as it floated upside-down in the Gulf.
 
 The Apportionment of Comparative Fault
 
 9
 The district court found the concurrent negligence of McDermott and Gator Marine through the imputed negligence of its servant, Captain Pitre to be the cause of the casualty. The trial judge found that McDermott was negligent in loading the spool on the tug without securing it against side-to-side movement. It is uncontested that the McDermott crew routinely loaded such cargo on vessels bound for the Gulf and that McDermott personnel had selected the TERRAL PERRY for this particular trip from a long list of company-owned and independent vessels at the offshore operations division's disposal. The chains and chain binders securing the spool were owned by McDermott. The TERRAL PERRY and its captain, on the other hand, were relatively inexperienced at the task of carrying cargo.
 
 
 10
 The trial judge found concurrent negligence attributable to Gator in Captain Pitre's failure to conduct periodic inspections of the cargo during the voyage. Such inspections, the Court reasoned, may well have inspired preventative or remedial action prior to the violent listing that made foundering in the Gulf inevitable. The court then allocated fault 60% to McDermott and 40% to Gator Marine.
 
 
 11
 The Supreme Court has sanctioned division of damages between negligent parties as an equitable solution to the problem of apportioning maritime losses occasioned by concurrent negligence. United States v. Reliable Transfer Company, Inc., 421 U.S. 397, 407, 95 S.Ct. 1708, 1713-1714, 44 L.Ed.2d 251 (1975). On the basis of our review of this record, we cannot say that the trial judge's findings of concurrent negligence and his apportionment of liability were clearly erroneous. Therefore, we are bound to affirm. Marcona Corp. v. Oil Screw SHIFTY III, 615 F.2d 206, 208 (5th Cir. 1980).
 
 
 12
 Both parties assert legal theories for overturning the trial court's application of comparative fault principles to this case. McDermott insists that, regardless of any negligence on its part in securing the spool of cable on the TERRAL PERRY, Gator Marine must bear ultimate responsibility for the negligent loading because a captain retains ultimate authority for the stowage of cargo on his vessel.
 
 
 13
 McDermott's argument misapprehends the federal admiralty law as it has stood for many years. Oxford Paper Company v. The Nidarholm, 282 U.S. 681, 683, 57 S.Ct. 266, 267, 75 L.Ed. 614 (1931) (apportioning damages between vessel and charterer-stevedore for cargo loss due to "faulty stowage of the deck loading (rendering) the ship topheavy and unseaworthy"). McDermott's attack on the trial court's decision to apportion fault is meritless. Therefore, because Gator Marine's recovery against McDermott far exceeds McDermott's judgment against Gator, McDermott's claim of a tort lien against the TERRAL PERRY in rem becomes essentially academic.[2]
 
 
 14
 Gator Marine raises a more convoluted objection to the use of comparative fault principles in this case. McDermott's functioning as a stevedore in loading the spool, Gator argues, gave rise to an implied warranty of workmanlike performance running from the stevedore to the vessel. Compare Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956) (holding stevedore liable to vessel for indemnity against claims of injured longshoremen under an implied warranty of workmanlike performance). McDermott's failure to secure the spool adequately, it is asserted, constitutes a breach of that warranty entitling Gator to indemnity from McDermott. Gator insists that concurrent negligence on its part does not preclude full recovery of its damages against McDermott on this breach of warranty theory.
 
 
 15
 It is true that a vessel's indemnity claim against a stevedore based on a breach of warranty is not necessarily precluded by a finding of negligence on the part of the vessel. Weyerhaeuser Steamship Co. v. Nacirema Operating Co., 355 U.S. 563, 567, 78 S.Ct. 438, 440, 2 L.Ed.2d 491 (1958). The Supreme Court has suggested that indemnification under the implied warranty ought not be defeated when the stevedore is in the best position to avoid the accident and the vessel has deferred to the stevedore's expertise in stowing the cargo. Italia Societa per Azioni di Navigazioni v. Oregon Stevedoring Co., 376 U.S. 315, 322-23, 84 S.Ct. 748, 752-753, 11 L.Ed.2d 732 (1964). Based on the district court's findings of fact, that is arguably the case here. It is also true that the Ryan doctrine has been extended beyond its original mooring in the vessel-stevedore-injured longshoremen relationship to the vessel-stevedore-damaged cargo setting. Master Shipping Agency, Inc. v. M. S. Farida, 571 F.2d 131, 133 (2d Cir. 1978) (vessel found liable for lost cargo on unseaworthiness grounds awarded indemnity from stevedore on breach of workmanlike performance warranty).
 
 
 16
 Nevertheless, we find the district court was correct in apportioning fault between stevedore and vessel and adjusting damages accordingly. In Ryan cases, the Supreme Court has never foreclosed the possibility that vessel negligence might defeat an indemnity recovery under the warranty of workmanlike performance doctrine. See Weyerhaeuser Steamship Company, 355 U.S. at 567, 78 S.Ct. at 440 (upon finding that stevedore breached its implied warranty, vessel "was entitled to indemnity absent conduct on its part sufficient to preclude recovery") (emphasis added); Italia Societa, 376 U.S. at 324, 84 S.Ct. at 754 ("liability should fall upon the party best situated to adopt preventative measures and thereby to reduce the likelihood of injury"). The district court found Gator's negligent failure to inspect the tenuously-secured cargo en route to the Gulf joined with McDermott's negligence to produce the casualty. We think that intervening vessel negligence of this magnitude was precisely the sort of conduct the Supreme Court anticipated in leaving open the possibility that an indemnity claim under the Ryan doctrine might be defeated or reduced. Compare Nat G. Harrison Overseas Corp. v. American Tug Titan, 516 F.2d 89, 96 (5th Cir. 1975) modified, 520 F.2d 1104 (5th Cir. 1975) (barge owner's recovery against stevedore for breach of warranty of workmanlike performance reduced by 50% because barge's unseaworthiness contributed to the casualty).
 
 
 17
 Moreover, we question the vitality of Ryan principles in disputes between a vessel and her stevedore over vessel and cargo damage. Except in the context of independent contractors on drilling barges, our Circuit has been reluctant to expand the applicability of the Ryan doctrine. See Thibodeaux v. Texas Eastern Transmission Corp., 548 F.2d 581, 585 (5th Cir. 1977). In 1972 Congress legislatively abrogated the Ryan doctrine at its point of origin, injured longshoremen. Longshoremen's and Harborworker's Compensation Act Amendments of 1972, Pub. L. 92-576, § 18(a) 44 Stat. 1426, codified at, 33 U.S.C. § 905(b). See also H. Rep. No. 92-1441, reprinted in (1972) U.S. Code Cong. & Ad. News, 4698, 4702-03, 4719. There is little logical appeal in this proposed extension of a doctrine so withered. Disputes between vessels and stevedores over damaged cargo are best accommodated by a straightforward application of the usual maritime comparative fault system.
 
 Prejudgment Interest
 
 18
 In keeping with the customary practice of admiralty courts, see Noritake Company, Inc. v. M/V Helenic Champion, 627 F.2d 724, 728-30 (5th Cir. 1980), the trial judge exercised his discretion to award prejudgment interest as compensation for deprivation of the use of funds. He set the interest rate at 10%. Gator Marine challenges this rate, complaining that it understates Gator's cost of borrowing money.
 
 
 19
 Admiralty courts enjoy broad discretion in setting prejudgment interest rates. They may look to the judgment creditor's actual cost of borrowing money, In Re M/V Vulcan, 553 F.2d 489 (5th Cir.), cert. denied, 434 U.S. 855, 98 S.Ct. 175, 54 L.Ed.2d 127 (1977), to state law, Geotechnical Corp. v. Pure Oil Corp., 214 F.2d 476 (5th Cir. 1954), or to other reasonable guideposts indicating a fair level of compensation. We cannot say that the trial court's establishment of a 10% rate constituted an abuse of discretion. In any case, there is no evidence on the record to substantiate Gator Marine's claim that its borrowing costs exceeded 10%. We will not disturb the judgment below.
 
 
 20
 AFFIRMED.
 
 
 
 [1]
 Gator Marine Towing Service, Inc., a Louisiana corporation owned by Raleigh J. & Velma Pitre, declared bankruptcy after the TERRAL PERRY, its only asset, sank in the Gulf. Gator Marine's trustee in bankruptcy originally brought this suit against McDermott, but withdrew after Blue Ridge Insurance Company, the TERRAL PERRY's casualty underwriter, settled the trustee's claim and took over prosecution of the claim as Gator Marine's subrogee
 Mr. Pitre, a ubiquitous presence in this case, intervened individually to recover from McDermott the $35,000.00 balance on a loan to Gator Marine he had personally guaranteed. Since the merits of his individual claim in this suit apportioning liability and fixing damages for the casualty are inextricably intertwined with Gator Marine's, our discussion of these issues henceforth refers to Gator Marine, but applies to Pitre's individual claim as well. In addition to his status as Gator Marine's creditor, Pitre served as captain of the TERRAL PERRY and as president and co-owner of Gator Marine.
 
 
 [2]
 McDermott's belated assertion of a tort lien at the August 24, 1978 foreclosure sale was raised for the first time nearly two years after McDermott knew of the loss. Prior to its intervention in the August foreclosure sale (the second such foreclosure attempt a June sale proved indecisive when the highest bidder failed to reappear with the balance owed after depositing 10% of the $60,000 bid), McDermott had never recorded its asserted lien under the procedure provided in 46 U.S.C. § 925(a) and 46 C.F.R. § 67.49-19 (1980). Even our Circuit's policy of liberality in permitting interventions in in rem proceedings against mortgaged vessels, see Point Landing, Inc. v. Alabama Dry Dock & Ship Building Co., 261 F.2d 861 (5th Cir. 1958), is strained by McDermott's claim here