**SMITH & KELLY COMPANY,**
Plaintiff-Appellant,

v.

**The S/S CONCORDIA TADJ, her engines, boilers, tackle, etc., A/S IDAHO and Christian Haaland, d/b/a Concordia Line, Defendants-Appellees.**

No. 82–8594.

United States Court of Appeals,
Eleventh Circuit.

Nov. 3, 1983.

Robert S. Glenn, Jr., Jonathan D. Sprague, Savannah, Ga., for plaintiff-appellant.

George H. Chamlee, Savannah, Ga., for defendants-appellees.

Before JOHNSON and HENDERSON, Circuit Judges, and ALLGOOD *, District Judge.

JOHNSON, Circuit Judge:

On April 4, 1978, while cleaning out a refrigerated hold aboard the S/S CONCORDIA TADJ ("the TADJ"), able-bodied seaman Luis Rafael Gonzales-Riveira was severely and permanently injured when he fell through an opening in one of the ship's hatch covers. The record clearly reflects that a series of negligent acts, omissions, and derelictions of duty committed by diverse parties over a period of approximately six months created the dangerous conditions that led to Gonzales-Riveira's injury.

The TADJ is a dry cargo vessel of Norwegian registry. Its No. 1 cargo hold is completely refrigerated and divided horizontally into three compartments, an upper 'tween deck, a lower 'tween deck, and a lower hold. A permanent lid of folding steel covers the weather deck hatch. The two lower hatch covers consist of wooden hatchboards fitted over steel beams. The

---

* Honorable Clarence W. Allgood, U.S. District Judge for the Northern District of Alabama, sitting by designation.

hatchboards must be removed and replaced by hand, usually by longshoremen during loading and unloading. The hatchboards are treated roughly, and they frequently split or break. It is the responsibility of the ship's chief mate to keep aboard ship a complement of spare hatchboards or materials for fashioning spares. In the Autumn of 1977 the chief officer of the TADJ, aware that the vessel carried no spare hatchboards for hold No. 1, ordered materials to make spares when the TADJ was in New York. The officer testified that "because of the summer holidays" he was unable to obtain the necessary materials. In late March 1978 the vessel called at Port Newark. There it unloaded the bulk of the cargo of frozen shrimp it carried in the No. 1 hold. While at Newark, the chief officer again requested that the shipowner, whose headquarters were in New York, procure spare hatchboards. By this time it was Easter, and again the ship was unable to obtain the spares. The TADJ called at Baltimore, Charleston, and then, on April 2, 1978, still without spare hatchboards, at Savannah.

The TADJ retained Smith & Kelly Company, a Savannah stevedore, to unload the remainder of the cargo of frozen shrimp from the No. 1 hold. On April 3, 1978, the longshoremen went into the hold and discovered that the stevedore in the previous port had not replaced the lower 'tween deck hatch cover. The longshoring gang found that a few hatchboards were missing. Longshoremen set aside two hatchboards that were split. The longshoring foreman in charge testified that he requested additional hatchboards from a member of the ship's crew and that, after checking, the crew member returned to tell the foreman that there were no spares aboard. The foreman told no ship's officer of the missing hatchboards. The longshoremen closed the hatch by covering with hatchboards the part of the hatch near where they were working and spacing the remaining boards from two to eight inches apart over the rest of the hatch. The gang then covered this section of the hatch with a sheet of plywood. After finishing its work, the gang left the hatch cover in this condition without informing a ship's officer. The TADJ sailed for New Orleans that evening.

Next day, the ship's bosun and three seamen, including Gonzalez-Riveira, went into the No. 1 hold to clean the debris from the previous day's operations. The men removed some hatchboards at the after end of the lower 'tween deck hatch and began sweeping trash into the lower hold. Gonzalez-Riveira spotted the sheet of plywood lying at the forward end of the hatch. He lifted the forward end of the plywood and began pushing it aft. He was unable to see the deck in front of him, and he fell through a twelve-inch gap between two hatchboards that lay underneath the plywood. The district court found that the ship's movement during the previous day had created vibrations which widened the opening between the hatchboards. When the TADJ reached New Orleans it obtained materials for making new hatchboards. The ship's records show that hands were engaged for five days in constructing spares.

Gonzales-Riveira filed suit in the United States District Court for the Southern District of Georgia against the appellees in this case, the A/S Idaho and Christian Haaland, d/b/a Concordia Line, the owners of the TADJ ("the shipowner"), and against the appellant in this case, Smith & Kelly. The district court dismissed the claim against the shipowner on jurisdictional grounds. Smith & Kelly settled Gonzales-Riveira's claim, and the court entered a consent judgment for $225,000. On June 5, 1981, Smith & Kelly filed this action against the shipowner seeking damages in indemnity, contribution, and equitable subrogation. The shipowner counterclaimed for indemnity seeking attorney's fees and expenses it incurred in Gonzales-Riveira's original suit. On August 16, 1982, the district court entered judgment against Smith & Kelly on both its claim and the shipowner's counterclaim and awarded the shipowner attorney's fees and expenses in the amount of $20,-422.24 plus interest. The district court's holding was based on the indemnity theory

of *Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp.,* 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956). There the Supreme Court held that, when a stevedore's breach of duty creates an unseaworthy condition on board a ship which in turn results in injury to a longshoreman, the stevedore must indemnify the ship's owner for the full amount of its liability to the injured longshoreman. The district court concluded that Smith & Kelly had breached its duty to perform its work safely and that *Ryan* therefore disentitled the stevedore from collecting any indemnity from the shipowner. Smith & Kelly appeals claiming that application of the all-or-nothing *Ryan* indemnity principle is inappropriate in this case and that this Court should instead adopt a division of damages based on each party's degree of fault. We agree.

## I. THE RISE AND FALL OF THE *RYAN* INDEMNITY DOCTRINE

The *Ryan* story really began with the Supreme Court's decision in *The Osceola,* 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760 (1903). There the Court launched the action for unseaworthiness which imposes on a shipowner liability for any injury to a seaman that results from the ship's condition of unseaworthiness. The shipowner's negligence is not a predicate to liability. *Mahnich v. Southern Steamship Co.,* 321 U.S. 96, 100–02, 64 S.Ct. 455, 457–58, 88 L.Ed. 561 (1944). In *Seas Shipping Co. v. Sieracki,* 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), the Court extended the shipowner's duty to maintain his ship in a seaworthy condition to cover any persons engaged in work traditionally done by seamen. This meant that shipowners would be liable for a longshoreman's injuries that result from the unseaworthiness of the ship.

The enormous potential for unfairness that *Sieracki* created soon became apparent. In many cases longshoremen are injured as a result of conditions of unseaworthiness that the stevedore, not the shipowner, cre-

ates. The Supreme Court responded in *Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp.,* 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956). The Court inferred from the contract between the stevedore and the shipowner a warranty, running from the stevedore to the shipowner, of "workmanlike service." This warranty imposes on the stevedore a duty to complete its work "properly and safely." *Id.* at 133, 76 S.Ct. at 237. Where the stevedore had breached the warranty of workmanlike service, creating a condition of unseaworthiness aboard ship that resulted in injury to a longshoreman, *Ryan* required the stevedore to indemnify the shipowner for any liability it incurred in a *Sieracki*-inspired suit. *Id.* at 132–35, 76 S.Ct. at 236–28.

The specific factual context of *Ryan* obscured the policy basis of the Supreme Court's decision.[1] The Court made that basis clear in subsequent opinions. In *Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co.,* 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732 (1964), the Court faced the question whether a stevedore could breach its warranty of workmanlike service non-negligently. The Court held that the stevedore owed the shipowner indemnity when, although neither party was negligent, a latent defect in equipment brought on board by the stevedore caused injury to a longshoreman. The Court concluded that "liability should fall upon the party best situated to adopt preventive measures and thereby to reduce the likelihood of injury. Where, as here, injury-producing and defective equipment is under the supervision and control of the stevedore, the shipowner is powerless to minimize the risk; the stevedore is not." *Id.* at 324, 84 S.Ct. at 754. Later, in *Scindia Steam Navigation Co. v. De Los Santos,* 451 U.S. 156, 171, 101 S.Ct. 1614, 1624, 68 L.Ed.2d 1 (1981), the Court reaffirmed this rationale when it stated that "[t]he approach of the indemnity cases in the Court, beginning with [*Ryan*], was that the stevedore was in the best position to avoid accidents during cargo operations

---

1. In *Ryan* the stevedore breached its warranty or workmanlike performance by insufficiently securing cargo it was loading at the port of origin. As a result, a longshoreman employed by the same stevedoring company was injured during unloading at the destination port.

and that the shipowner could rely on the stevedore's warranty to perform competently." *Ryan*, therefore, was based on the observation that as a general matter the stevedore, not the shipowner, can best protect against injuries to longshoremen during cargo operations. At its core, *Ryan* was a somewhat rough attempt to apportion liability on the basis of the parties' relative abilities to avoid accident.

The Supreme Court made one major refinement in the doctrine shortly after it decided *Ryan*. In *Weyerhauser Steamship Co. v. Nacirema Operating Co.*, 355 U.S. 563, 567, 78 S.Ct. 438, 440, 2 L.Ed.2d 491 (1958), the Court acknowledged that in a *Ryan* case the shipowner is entitled to indemnity only "absent conduct on its part sufficient to preclude liability." Although this language opened a potential channel of escape from *Ryan* indemnity, courts tended to construe the exception narrowly. The former Fifth Circuit concluded that " 'conduct sufficient to preclude liability' means conduct on the part of the shipowner which prevents the stevedore's workmanlike performance." *Brock v. Coral Drilling, Inc.*, 477 F.2d 211, 217 (5th Cir.1973).[2] *But see Hurdich v. Eastmount Shipping Corp.*, 503 F.2d 397, 401–02 (2d Cir.1974) (applying the *Italia Societa* language to hold that because the shipowner was the "party best situated

to adopt preventive measures" its failure to adopt such measures constituted conduct sufficient to preclude recovery).

In the wake of the *Ryan* decision, courts began to extend its indemnity principle to a number of new factual contexts. The former Fifth Circuit inferred warranties of workmanlike performance from ship repair contracts, *Lusich v. Bloomfield Steamship Co.*, 355 F.2d 770, 775–76 (5th Cir.1966), from engine repair contracts, *Parfait v. Jahncke Service, Inc.*, 484 F.2d 296 (5th Cir.1973), *cert. denied*, 415 U.S. 957, 94 S.Ct. 1485, 39 L.Ed.2d 572 (1974), and from a contract to test pipes aboard an oil well drilling barge. *Whisenant v. Brewster-Bartle Offshore Co.*, 446 F.2d 394, 399–401 (5th Cir.1971).

This expansive tide began to ebb when, in 1972, Congress reversed both *Ryan* and *Sieracki* in their original context. Amendments to the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 901 *et seq.*, prohibited seaworthiness suits by longshoremen against vessel owners and prohibited vessel owners from collecting indemnity from stevedores based on implied or express warranties.[3] After enactment of the 1972 Amendments, the former Fifth Circuit became reluctant to extend *Ryan* indemnity to new factual situations.[4] *See*

---

**2.** In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent the decisions of the Fifth Circuit rendered prior to October 1, 1981.

**3.** 33 U.S.C.A. § 905(b) provides:

(b) In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel. If such person was employed by the vessel to provide ship building or repair services, no such action

shall be permitted if the injury was caused by the negligence of persons engaged in providing ship building or repair services to the vessel. The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter.

It is worth emphasizing that injured longshoremen may still prosecute actions against shipowners based on tort negligence theories.

**4.** The appellee claims that the Supreme Court in *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), indicated that the 1972 Amendments are not to be taken as a retreat from *Ryan* in any context other than that in which Congress explicitly forbade its application. This is an incorrect reading of that decision. The Court stated:

[A]s our cases indicate, the stevedore normally warrants to discharge his duties in a

*Thibodeaux v. Texas Eastern Transmission Corp.,* 548 F.2d 581, 584–85 (5th Cir.1977) (refusing to infer any warranty running from pipeline company to pipeline construction contractor that would provide indemnity to contractor for liability to pipeline company's inspector for injuries received while aboard contractor's barge); *In re Dearborn Marine Service, Inc.,* 499 F.2d 263, 287 (5th Cir.1974) (refusing to extend *Ryan* to indemnify a vessel owner whose captain's improper mooring was a causative factor in an oil platform explosion although other defendants' negligence also caused the accident), *cert. dismissed,* 423 U.S. 886, 96 S.Ct. 163, 46 L.Ed.2d 118 (1975). The most recent and most severe blow to the *Ryan* indemnity doctrine came in *Gator Marine Service Towing, Inc. v. J. Ray McDermott & Co.,* 651 F.2d 1096 (5th Cir. Unit A 1981). In that case the stevedore improperly secured a 15-ton spool of cable to the deck of a tug, causing the tug to capsize. The trial court found both the stevedore and the vessel negligent, and the vessel claimed *Ryan* indemnity from the stevedore. After recog-

> workmanlike manner; and although the 1972 Amendments relieved the stevedore of his duty to indemnify the shipowner for damages paid to longshoremen for injuries caused by the stevedore's breach of warranty, they did not otherwise disturb the contractual undertaking of the stevedore nor the rightful expectation of the vessel that the stevedore would perform his task properly without supervision by the ship.

*Id.* at 170, 101 S.Ct. at 1624. At this point we must distinguish between *Ryan's* twin holdings. "The *Ryan* doctrine . . . includes two facets: an implied undertaking by a stevedore to render workmanlike performance and the stevedore's duty to indemnify the owner for liability arising out of its breach of duty." *Agrico Chemical Co. v. M/V Ben W. Martin,* 664 F.2d 85, 93 (5th Cir.1981) (non-binding). The first of these principles retains its vitality. What Congress abandoned in the 1972 Amendments was the notion that any breach of the stevedore's warranty of workmanlike service requires him to indemnify the vessel for all liability that breach might cause, regardless of the fault of the vessel. The Supreme Court's declaration in *Scindia* distinguishes between the existence of the warranty and the duty to indemnify, and reaffirms only the warranty principle of *Ryan.* Like the Court in *Gator Marine Service Towing, Inc. v. J. Ray McDermott & Co.,* 651 F.2d 1096, 1100 (5th Cir. Unit A 1981), we view the 1972

nizing the reluctance of the former Fifth Circuit to extend *Ryan* and noting that the 1972 Amendments had "legislatively abrogated the *Ryan* doctrine at its point of origin," the Court concluded that "[t]here is little logical appeal in this proposed extension of a doctrine so withered." *Id.* at 1100. Instead, the Court approved apportionment of liability based on "a straightforward application of the usual maritime comparative fault system." *Id.*

## II. APPLICATION OF *RYAN* INDEMNITY TO SEAMEN'S INJURIES

We must first determine whether precedent requires us to apply the *Ryan* indemnity principle in this case. Our facts differ substantially from *Ryan* in that here the unseaworthy condition of the ship resulted in injury to a seaman at sea rather than to a longshoreman during cargo operations. No case in the Eleventh or Fifth Circuit has required a stevedore to indemnify a shipowner for the shipowner's liability to one of its own employees.[5] We find no Supreme Court precedent requiring such application.[6]

> Amendments as casting doubt on the continued vitality of the *Ryan* indemnity principle.

**5.** *But see Hurdich v. Eastmount Shipping Corp.,* 503 F.2d 397 (2d Cir.1974), discussed at note 7, *infra.*

**6.** The appellee claims that the Supreme Court has identified the shipowner's employees as "beneficiaries of the stevedore's warranty of workmanlike service" citing the following language:

> Where the shipowner is liable to the employees of the stevedore company *as well as its employees* for failing to supply a vessel and equipment free of defects, regardless of negligence, we do not think it unfair or unwise to require the stevedore to indemnify the shipowner for damages sustained as a result of injury-producing defective equipment supplied by a stevedore in furtherance of its contractual obligations.

*Italia Societa, supra,* 376 U.S. at 324, 84 S.Ct. at 754 (appellee's emphasis). The appellee's contention is based on a misreading of the content and the context of this passage. The *Italia Societa* case involved injuries to a longshoreman, not to an employee of the shipowner. The words "as well as its employees", which the appellee emphasizes, refer to the liability of the shipowner, not the stevedore.

■ Nor does it appear to us that the policy mooring of the *Ryan* doctrine demands its application in this case. In *Ryan* the rationale for requiring stevedores to indemnify shipowners fully for injuries to longshoremen rested on the conclusion that, as a general matter, the stevedore is better positioned to avoid such injuries during cargo operations. But this generalization does not apply to protection of seamen. The vessel's nondelegable duty of seaworthiness is premised on a contrary generalization: that shipowners are best able to protect seamen from injuries aboard ship. "We have consistently refrained from extending the *Ryan*-type indemnity 'beyond those controversies involving the special rules governing the obligations and liability of shipowners which necessitated its formulation and justify its application.'" *Thibodeaux v. Texas Eastern Transmission Corp.,* 548 F.2d 581, 585 (5th Cir.1977), *quoting In re Dearborn Marine Service, Inc.,* 499 F.2d 263, 287 (5th Cir.1974) (quotation omitted). We do not believe that the original justification for *Ryan* indemnity applies to controversies involving seamen injured at sea; we therefore decline to extend *Ryan* indemnity principles to such disputes.[7]

### III. APPLICATION OF THE PRINCIPLES OF COMPARATIVE FAULT

Having concluded that the *Ryan* doctrine does not require us to impose liability on Smith & Kelly, we perceive three options for apportioning damages between the shipowner and the stevedore: (1) engage in an analysis, reminiscent of *Ryan,* to determine whether *as a general matter* shipowners or stevedores are better able to take protective measures in cases such as this and impose liability on that class *in all cases;* (2) engage in an analysis, reminiscent of *Hurdich, see* note 5, *supra,* to determine whether *in this case* Smith & Kelly or the vessel was best positioned to avoid the accident and impose liability on that party;[8] (3) apportion liability between the parties by applying principles of comparative fault. The first two of these methods, like *Ryan* indemnity, are all-or-nothing allocations of liability. We choose the third for several reasons.

■ First, apportionment of liability on the basis of comparative fault best advances the goals *Ryan* attempted to achieve. *Ryan* was in large part aimed at enhancing safety by placing liability on the party best able to avoid accidents and thereby encouraging that party to take precautionary measures. *Ryan's* imposition of liability on the class generally best able to avoid accident is, however, ill suited to achieve this end because it immunizes members of the other class from responsibility for prevention. If we extended *Ryan* in-

The Court's intended emphasis was on the extension of the shipowner's liability to the stevedore's employees; this extension, the Court explained, justifies requiring the stevedore to indemnify the shipowner for its liability to injured longshoremen when those injuries are the result of the stevedore's own unsafe practices. Thus viewed, the quoted passage is damaging to the appellee's contention in that it indicates that the rationale for *Ryan* indemnity is the extension of the shipowner's duty to longshoremen, not the previously existing duty of the shipowner to his own employees.

7. *Cf. Rodriguez v. Olaf Pedersen's Rederi A/S,* 527 F.2d 1282 (2d Cir.1976); and *Hurdich v. Eastmount Shipping Corp.,* 503 F.2d 397, 400–02 (2d Cir.1974). In *Hurdich* improper cleanup during stevedoring operations left debris on which a seaman was injured two weeks later. The *Hurdich* court abandoned the circuit's traditional "prevent and hinder" test in determining whether the vessel's subsequent failure to clean the debris constituted conduct "sufficient to preclude indemnity." *See Weyerhauser Steamship Co., supra.* Instead, the court borrowed language from *Italia Societa, supra,* to hold that liability should fall on the party "who was in the optimal position to prevent the injury." 503 F.2d at 402. In *Rodriguez* the Second Circuit explained that although application of the "optimal position to prevent injury" test was proper given the facts of *Hurdich,* the circuit had not abandoned the prevent and hinder test in more typical *Ryan* cases. The court distinguished *Hurdich* in part on the ground that "[t]he plaintiff in *Hurdich* was a member of the ship's crew, rather than, as in this case, a contributorily negligent employee of the stevedore." 527 F.2d at 1286.

8. The district court found that Smith & Kelly was the party best able to avoid the accident although this finding was unnecessary for its *Ryan* analysis.

demnity to protect vessels in cases like this one, shipowners would no longer have any incentive to correct unseaworthy conditions left by stevedores, and they would have little reason to maintain equipment, such as hatchboards, necessary for stevedores to perform in a workmanlike manner. Similarly, a system which imposes complete liability on the party best able to avoid accident in each case provides little incentive for the other party to take prophylactic steps. In this case either Smith & Kelly or the TADJ could have prevented the accident: Smith & Kelly by refusing to work until adequate hatchboards were available or by informing the ship's officer of the condition of the hatch; the TADJ by maintaining a proper supply of spare hatchboards or by inspecting the hatch before sending men to work near it. Avoidance of future accidents can be best achieved by interesting *both* parties in greater care. At the same time, comparative fault matches the power of its incentives to the ability of each party to prevent injury. As the Supreme Court has concluded in a similar context, "[a] rule that divides damages by degree of fault would seem better designed to induce care ... because it imposes the strongest deterrent upon the wrongful behavior that is most likely to harm others." *United States v. Reliable Transfer Co.,* 421 U.S. 397, 405 n. 11, 95 S.Ct. 1708, 1713 n. 11, 44 L.Ed.2d 251 (1975).

Second, application of comparative fault principles is the fairest solution. *Ryan*-like indemnity creates great potential for injustice. Under *Ryan,* the indemnitor need not be at fault—breach of the warranty of workmanlike service may be non-negligent. *Italia Societa, supra.* Moreover, mere negligence committed by the indemnitee does not defeat indemnity. *Brock v. Coral Drilling, Inc.,* 477 F.2d 211, 217 (5th Cir.1973). *Ryan* principles may, therefore, require a non-negligent stevedore to indemnify a vessel for liability that the vessel owner's negligence partially caused. Nor is supposition necessary to make the point; application of

an all-or-nothing liability scheme would be inequitable in this case. It is clear that *both* Smith & Kelly and the shipowner and its agents acted negligently, and to require either party to shoulder full liability while allowing the other to escape contribution would simply be unfair. The Supreme Court said as much when it pointed out the injustice of the equally arbitrary rule of divided damages [9] in maritime collision cases:

> An equal division of damages is a reasonably satisfactory result only where each vessel's fault is approximately equal and each vessel thus assumes a share of the collision damages in proportion to its share of the blame, or where proportionate degrees of fault cannot be measured and determined on a rational basis. The rule produces palpably unfair results in every other case. For example, where one ship's fault in causing a collision is relatively slight and her damages small, and where the second ship is grossly negligent and suffers extensive damage, the first ship must still make a substantial payment to the second. "This result hardly commends itself to the sense of justice any more appealingly than does the common law doctrine of contributory negligence...."

*United States v. Reliable Transfer Co.,* 421 U.S. 397, 405, 95 S.Ct. 1708, 1713, 44 L.Ed.2d 251 (1975). Any system that imposes some arbitrary apportionment of liability rather than division based on the parties' degree of fault will produce such injustice.

Finally, a wave of recent precedent calls for application of comparative fault principles. In *Reliable Transfer, supra,* the Supreme Court adopted comparative fault as the standard for dividing damages in vessel collision cases. Subsequently, the former Fifth Circuit applied comparative fault in a number of other maritime contexts. In *Gator Marine Service Towing,* 651 F.2d at 1100, the Court refused to apply the *Ryan* indemnity doctrine to disputes between a

**9.** That rule divided damages equally between two negligent vessels regardless of their relative degrees of fault.

vessel and a stevedore over liability for cargo damage. Instead the Court concluded that such disputes "are best accommodated by a straightforward application of the usual maritime comparative fault system." The former Fifth Circuit also adopted comparative fault allocation of damages in some personal injury cases. In *Leger v. Drilling Well Control, Inc.*, 592 F.2d 1246 (5th Cir.1979), a repairman was injured while on his employer's barge servicing an offshore oil well. The issue was the apportionment of damages between the oil well owner and the employer. The Court divided damages based on each party's degree of fault holding that "[t]he reasoning of *Reliable Transfer* loses none of its cogency in the context of a non-collision personal injury case." *Id.* at 1249. The new Fifth Circuit has continued to apply comparative fault principles to maritime non-collision personal injury cases. *See Loose v. Offshore Navigation, Inc.*, 670 F.2d 493, 499–500 (5th Cir. 1982). The clear trend in maritime cases is to reject all-or-nothing or other arbitrary allotments of liability in favor of a system that divides damages on the basis of the relative degree of fault of the parties.

For these reasons we adopt a rule for cases of the sort presented here that requires damages to be allocated between stevedores and shipowners based on the degree of fault [10] each bears for the injury. Because no analysis of fault was necessary under the district court's *Ryan* analysis, we remand for a determination on the issue of division of damages.

REVERSED and REMANDED.

---

10. We recognize that in the present context the notion of "fault" must include more than negligence; it must also encompass non-negligent breaches of the shipowner's duty to maintain the vessel in a seaworthy condition and of the stevedore's warrant of workmanlike performance. Of course, our decision is inconsistent with any conclusion that the stevedore's warranty in any way relieves the vessel owner of his duty. Instead, fault must be determined by evaluating the degree to which (a) each party breached its duty or was negligent, and (b) each party's breach or negligence caused the accident.