[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**

**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**JULY 31, 2003**
**THOMAS  K. KAHN**
**CLERK**

_____

No. 01-15975

_____

D.C. Docket No. 99-07059 CV-WDF

JOHN VIERLING,

Plaintiff,

versus

CELEBRITY CRUISES, INC.,

Defendants–Cross-Claimaints–
Cross-Defendants–
Appellants-Cross-Appellees,

versus

BROWARD COUNTY,

Defendant–Cross-Claimant–
Cross-Defendant–
Appellee-Cross-Appellant,

WOLLARD AIRPORT EQUIPMENT CO., INC.,
CRITON TECHNOLOGIES,
f.k.a. Wollard Airport Equipment Co., Inc.

Defendants–Cross-Defendants.

Appeal from the United States District Court
for the Southern District of Florida

_____

**(July 31, 2003)**

Before TJOFLAT and ANDERSON, Circuit Judges, and STAFFORD\*, District Judge.

TJOFLAT, Circuit Judge:

Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp., 350 U.S. 124, 132-35, 76 S. Ct. 232, 236-38, 100 L. Ed. 133 (1956), held that a stevedore owes a shipowner a duty of workmanlike performance such that, if the duty is breached, the stevedore must indemnify the shipowner for damages it is required to pay a longshoreman who is injured aboard its vessel. The principal issue in this case, brought by the owner of a cruise ship against a port authority, is whether Ryan's holding (the "Ryan doctrine") entitles the shipowner to indemnification for damages it paid to a passenger because the port authority failed to load passengers aboard the cruise ship in a workmanlike manner. We hold that the Ryan doctrine applies. We therefore vacate the district court's summary judgment in favor of the port authority and remand the case for further proceedings.

_____

\* Honorable William H. Stafford, Jr., United States District Judge for the Northern District of Florida, sitting by designation.

I.

In the early morning of September 21, 1996, the M/V Century cruise ship, owned by Celebrity Cruises, Inc. ("Celebrity"), arrived in Port Everglades, Florida and was secured to the pier at Terminal 19, which was owned and operated by the Port Everglades Port Authority (the "Port Authority"), a department of Broward County, Florida.[1] The ship was properly moored and remained so throughout the day. After the ship was moored, a Port Authority terminal lead service worker, Elaine Lyons – acting pursuant to a prearranged agreement in which the Port Authority agreed to provide Celebrity with certain services, including a passenger loading bridge and gangway, in exchange for a $5.35 per embarking passenger fee[2] – moved a passenger loading bridge into position on the M/V Century to prepare for boarding. Although the manufacturer of the passenger loading bridge required the bridge to be positioned two feet from the ship, Lyons positioned it by sight, which admittedly ranged from three to six feet away from the side of the

---

[1] Since 1994, the Port Authority has officially been known as Port Everglades Department, a department of Broward County, Florida.

[2] Port Everglades Tariff 11 evidences the contractual relationship between the Port Authority and all incoming vessels. The tariff provides the rules and regulations of the port; all users are bound by its terms. The tariff requires, among other things, that all vessels desiring a birth at Port Everglades apply for certain services, including the furnishing and operation of passenger loading bridges.

3

ship.[3]  Following the positioning of the bridge, Lyons extended a gangway from the bridge over the remaining three to six foot gap and attached it to the M/V century.[4]  With the bridge and gangway in place, passenger boarding could commence.

Passengers began boarding the M/V Century later that afternoon.  In order to board the ship, passengers walked from the terminal through the covered passenger loading bridge, crossed over the uncovered gangway, and stepped onto the ship.  Once they crossed the gangway, passengers were greeted by Celebrity social hostesses.  As the passengers filed through the loading bridge and onto the ship, the weather started to turn sour, with light rain and 15-20 knot winds.  Due to the rain, passengers traversed the exposed gangway one at a time. Celebrity continued to load passengers despite the inclement weather.

At approximately 3:25 p.m., with the rain now pouring and winds blowing very hard, passenger John Vierling and his wife proceeded to the end of the

---

[3] The positioning of the passenger loading bridge by sight was Lyons's usual practice.  It was also how she was trained by her Port Authority supervisors.  No specific guidelines or measurements regarding the correct distance from the ship were given.  As Lyons described the positioning process: "I just have my own vision of where to stop."

[4] The gangway had a design length of nine feet.  The manufacturer's instructions stated that the passenger loading bridge should be positioned two feet from the side of the vessel, leaving seven feet of reserve gangway in the vestibule of the passenger loading bridge.  Since Lyons positioned the bridge from three to six feet from the vessel, the amount of reserve gangway was reduced from seven feet to anywhere between six and three feet, a 14.3% and 57.1% reduction, respectively.

loading bridge and prepared to cross the gangway. Vierling's wife went first and successfully stepped aboard the M/V Century. As Vierling walked across the gangway, however, a sudden gust of wind approaching forty-five miles an hour pushed the ship away from the dock. The distance the ship moved from the dock exceeded the length of reserve gangway in the vestibule of the passenger loading bridge,[5] causing the gangway to pull out of the end of the bridge. The gangway, with Vierling clinging to its hand-rails, swang down and slammed into the side of the ship. The impact severely injured Vierling's face, knocked loose his grip of the hand-rails, and caused him to fall approximately forty-five feet into the water below. He was safely rescued and taken to the hospital where he remained for several days.

Vierling subsequently filed suit against Celebrity and the Port Authority to recover damages for his injuries.[6] Celebrity answered the complaint and denied any wrongdoing. In addition, it filed a two-count cross-claim against the Port

[5] The actual distance the M/V Century moved from the dock is disputed. Most witnesses put the movement at four to six feet, while one witness recalls the vessel moving up to nine feet. If the jury finds that the vessel moved four to six feet, then the reserve gangway when the bridge was properly positioned (seven feet) would have sufficed to prevent the separation of the gangway from the bridge. If, on the other hand, the jury finds the distance to have been nine feet, then the movement of the vessel would have been too great even for a properly positioned bridge.

[6] The complaint also named Wollard Airport Equipment Company, the manufacturer of the passenger loading bridge and gangway, as a defendant. Wollard is not a party in this appeal.

Authority, seeking indemnification for any damages it may be required to pay Vierling. The first count, sounding in negligence, alleged that the Port Authority failed to exercise due care in several respects, including the manner in which it positioned the passenger loading bridge and gangway on the day of the accident.[7] The second count, sounding in contract law, alleged that the Port Authority breached its implied warranty of workmanlike performance when it failed to position properly the passenger loading bridge and gangway.[8] According to Celebrity, the ship's movement would have been well within the gangway's designed safety margin had the loading bridge been positioned properly. That is, had the passenger loading bridge been correctly positioned closer to the ship – two feet, rather than three to six feet – the length of the excess gangway remaining in the passenger loading bridge would have been sufficient to cover the distance the ship moved from the dock, and the gangway would not have pulled out from the end of the bridge.

The Port Authority responded to both Vierling's complaint and Celebrity's cross-claim by filing motions to dismiss based on the doctrine of sovereign

---

[7] The first count was based on a breach of duty owed to Vierling. Celebrity did not allege a breach of duty owed to it. Consequently, Celebrity could not have recovered from the Port Authority on its negligence claim. Regardless, the first count is not implicated in this appeal.

[8] Celebrity alleged that the contractual relationship between the parties impliedly warranted a duty of workmanlike performance.

immunity. While the motions were pending, the Port Authority answered the complaint and cross-claimed against Celebrity for indemnification with respect to any damages it may be required to pay Vierling.[9] As to the complaint, the Port Authority denied any wrongdoing and put forth fourteen affirmative defenses, including that Vierling's injuries were caused by parties (including Celebrity) not under the control or supervision of the Port Authority. As to Celebrity's cross-claim, the Port Authority denied the allegations of both counts of the cross-claim, except the allegation that it "owned, operated, and maintained the passenger loading bridge and portable brow or gangway." The Port Authority also asserted twelve affirmative defenses against the counts.[10] The affirmative defense relevant here is the allegation that the Port Authority enjoyed sovereign immunity.

After the parties joined issue, the case went to mediation, the court denied the Port Authority's motions to dismiss based on sovereign immunity, and Celebrity settled with Vierling. Celebrity also moved for summary judgment on the second count of its cross-claim, based on the implied warranty of workmanlike performance. The Port Authority's response to Celebrity's motion assumed that

---

[9] As explained infra, the Port Authority's cross-claim was based on a contractual indemnification provision contained in Port Everglades Tariff 11.

[10] Many were duplicative. The only affirmative defense relevant here is that set out in the text.

an implied warranty existed and argued that Celebrity could not recover because its "active negligence" caused Vierling's injuries. As part of its response, therefore, the Port Authority moved the court to grant it summary judgment on the second count of Celebrity's cross-claim.

The district court accepted the Port Authority's argument, denied Celebrity's motion for summary judgment, and granted the Port Authority summary judgment on the second count of Celebrity's cross-claim. The record, according to the court, established that Celebrity was "actively" negligent – namely, by failing to keep the M/V Century properly docked to Terminal 19, and by not responding to the worsening weather conditions.[11]

With this ruling in hand, the Port Authority settled with Vierling and moved the court to grant it summary judgment on its cross-claim against Celebrity. The cross-claim was based on the theory that Celebrity's negligence caused Vierling's injuries and that Celebrity's contract with the Port Authority, as evidenced in Port Everglades Tariff 11, expressly provided that Celebrity would indemnify the Authority for "claims, charges, expenses, penalties and damages arising out of any

---

[11] When the district court decided to base its decision on tort law rather than contract law, it should have first determined whether the second count of Celebrity's cross-claim stated a claim for negligence against the Port Authority – specifically, whether that count alleged that the Authority owed Celebrity a duty to exercise due care in boarding M/V Century's passengers. No such allegation was made; thus, the count failed to state a claim against the Port Authority.

8

accident or other occurrence causing injury to any persons."

The district court denied the Port Authority's motion, taking the same approach it had used in disposing of Celebrity's motion for summary judgment. It found that the Port Authority was "actively" negligent in the manner in which it had positioned the passenger loading bridge and gangway at the time Vierling was boarding the M/V Century, and that such negligence was a proximate cause of Vierling's injuries.[12]

Celebrity now appeals the district court's decision granting the Port Authority summary judgment on the second count of Celebrity's cross-claim, which sought indemnification on the theory that the Port Authority breached its implied warranty of workmanlike performance. Celebrity contends that had the district court applied contract law, which underpins the Ryan doctrine, instead of tort law, it would have denied the Port Authority's motion for summary judgment. The Port Authority cross-appeals, contending that the district court erred in failing to find that it was protected from suit by virtue of sovereign immunity.[13]

We initially address the issue of whether the Port Authority is entitled to

---

[12] By implication, in denying the Port Authority's motion for summary judgment on the Authority's cross-claim against Celebrity, the court granted Celebrity summary judgment on that cross-claim.

[13] The Port Authority is not appealing the district court's decision granting Celebrity summary judgment on the Port Authority's cross-claim for indemnification.

sovereign immunity. Concluding that it is not, we consider whether the Port

Authority owed Celebrity a duty of workmanlike performance and, if it did,

whether the record contains evidence (sufficient to withstand a motion for

summary judgment) that the Authority breached that duty and that such breach

was a proximate cause of Vierling's injuries.


## II.

The Eleventh Amendment provides:

> The Judicial power of the United States shall not be
> construed to extend to any suit in law or equity,
> commenced or prosecuted against one of the United
> States by Citizens of another State, or by Citizens or
> Subjects of any Foreign State.[14]

U.S. Const. amend XI. It is well settled that the reference to actions "against one

of the United States" "encompasses not only cases in which the State itself is

named as a defendant, but also certain actions against state agents and state

instrumentalities." Shands Teaching Hosp. & Clinic, Inc. v. Beech Street Corp.,

---

[14] The Port Authority begins its reply brief by stating that its "claim of immunity from suit in the instant admiralty action is not based on the Eleventh Amendment, but rather on state sovereign immunity." The remainder of its brief, however, indicates that it is in fact asserting the sovereign immunity the Eleventh Amendment provides. The Port Authority's arguments attempting to distinguish state sovereign immunity and Eleventh Amendment immunity are undecipherable. When addressing the Port Authority's cross-appeal, therefore, we focus on the Eleventh Amendment immunity.

208 F.3d 1308, 1311 (11th Cir. 2000) (citing <u>Regents of the Univ. of Cal. v. Doe</u>, 519 U.S. 425, 429, 117 S. Ct. 900, 137 L. Ed. 2d 55 (1997)).  In deciding whether a state agency or instrumentality may invoke the state's immunity as an arm of the state, we have recognized three factors: (1) how state law defines the entity; (2) what degree of control the state maintains over the entity; and (3) from where the entity derives its funds and who is responsible for satisfying the judgments against the entity.  <u>Id.</u>  Although no single factor is dispositive, the third factor, the source of the entity's funds and responsibility for satisfying judgments, is "of considerable importance."  <u>Doe</u>, 519 U.S. at 430, 117 S. Ct. at 904.   "Thus, when an action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit."  <u>Id.</u> at 429, 117 S. Ct. at 903-04 (internal quotation marks omitted).

In our view, all three factors point away from Eleventh Amendment immunity here.  First, Florida law treats the Port Authority as an entity of the county and not of the state.[15]  <u>See</u> <u>Mt. Healthy City Bd. of Educ. v. Doyle</u>, 429

---

[15] The Port Authority points out that the Florida Supreme Court has determined that counties are arms of the state, <u>Keggin v. Hillsborough County</u>, 71 So. 372, 373 (Fla. 1916), and, as such, argues it should enjoy the state's right to sovereign immunity.  We are not persuaded; our reading of the relevant provisions of Florida law indicates that the Port Authority (as a department of Broward County) is not a mere agent of the State of Florida.   First, a recent Florida Supreme Court decision casts doubt on the extent to which counties performing proprietary functions – such as providing passenger loading services – are considered the state for the purposes of immunity.  <u>See</u> <u>Canaveral Port Auth. v. Dep't of Revenue</u>, 690 So. 2d 1226,

11

U.S. 274, 280, 97 S. Ct. 568, 572, 50 L. Ed. 2d 471 (1977) (stating that Eleventh Amendment immunity does not extend to counties). Second, the state has no control over the operation of the Port Everglades facilities. See e.g., Fla. Stat. ch. 125.012 (providing the county, as the owner of the Port Authority's facility, with the authority to own, operate, and manage the facility, and the authorization to charge fees for its use). Finally, and most importantly, the Port Authority is a totally self-sufficient enterprise that receives no financial support from the state.[16]

_____

1228 (Fla. 1996) (finding that "only the State and those entities which are expressly recognized in the Florida Constitution as performing a function of the state comprise 'the state' for purposes of immunity from ad valorem taxation"). Second, Florida law gives counties an independent status in operating port facilities. For example, (1) Florida law provides counties with the authority to own, operate, and manage port facilities, and the authorization to charge fees for use of a port facility, Fla. Stat. ch. 125.012; (2) Florida law authorizes counties to issue bonds for the purpose of paying for all or part of the cost of operating the port facilities, Fla. Stat. ch. 125.013, 125.015; and (3) Florida law permits county commissioners to sue or be sued in their operation of a port facility, Fla. Stat. ch. 125.15. Each of these statutory provisions indicates that the Port Authority is independent of the State of Florida. See Moor v. Alameda County, 411 U.S. 693, 719-20, 93 S. Ct. 1785, 1800-01, 36 L. Ed. 2d 596 (1973). Finally, the Port Authority's history highlights the Authority's independent nature. Prior to 1994, the Port Authority was an independent, private entity. In 1994 – pursuant to the electorate of Broward County – the Port Authority was dissolved as an independent entity, and all of its property was transferred to the county. As part of the dissolution and transfer, however, all money and revenues accruing from the operations of the port were to be used by the county "only for the purposes related to Port Everglades . . . for which such moneys and revenues could have been used by the Port Everglades District and Port Everglades Authority had they not been dissolved and their assets and liabilities not been transferred to Broward County . . . ." Fla. Laws ch. 91-346. In other words, the Port Authority continued to operate under the same strictures after the vote. The only distinction post the 1994 vote is that the county owns the port. In our view, the fact that all else remained the same strongly suggests that the port has retained its independence from the State of Florida.

[16] The Port Authority refers us to the fact that it is funded by the Florida Seaport Transportation and Economic Development Program (FSTEDP), and argues the receipt of funds from this entity indicates it is an arm of the State of Florida. There is no evidence, however,

12

All the money that the Port Authority needs to run its operations comes from revenues it generates.[17] No tax money goes to the Port Authority, and any judgment or claim against it is paid by the Port Authority alone, from a portion of its funds dedicated, in its budget, to satisfying claims brought against it.

Overall, there is remarkably little difference between the Port Authority here, and the port authority in Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30, 115 S. Ct. 394, 130 L. Ed. 2d 245 (1994), which the Supreme Court failed to cloak with Eleventh Amendment immunity. The Port Authority has an anticipated and actual history of financial and operational independence. Id. at 49, 115 S. Ct. at 405. It is financially self-sufficient, generates its own revenues, and pays its own debts. Id. at 52, 115 S. Ct. at 406. Additionally, the state's treasury is not affected in any way by the Authority's actions. Id. at 51, 115 S. Ct. at 406. For these reasons, we affirm the district court's ruling that the Port Authority is not an arm of the state, and, consequently, is not entitled to sovereign immunity.

---

regarding the amount of funds, if any, the Port Authority has received from FSTEDP. What is clear is that despite the amount received, the Authority does not rely on FSTEDP funds to operate or satisfy liabilities or claims. Regardless, it is not the receipt of money that affects the analysis, but whether the Port Authority acts independently of the state. See Mt. Healthy, 429 U.S. at 280, 97 S. Ct. at 573 (noting that school board received "significant amount of money from the state," yet concluding that school board acted like an independent local entity and not an arm of the state). Here, it is clear that the Port Authority acts independently of the state.

[17] The Port Authority generated over $14.4 million in cruise-related revenues in the fiscal year following the 1996 accident. It has continued to grow since then.

III.

Every contract involving the rendering of services includes the implied promise to perform those services with reasonable care, skill, and safety. See Williston on Contracts § 62:25 (4th ed. 2002). The applicability of this hornbook rule to maritime service contracts was first enunciated in Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp., 350 U.S. 124, 132-35, 76 S. Ct. 232, 236-38, 100 L. Ed. 133 (1956), where the Supreme Court ruled that stevedores and other contractors give shipowners an implicit warranty that their services will be performed in a "workmanlike" manner. The Court explained that the "warranty of workmanlike service" compares "to a manufacturer's warranty of the soundness of its manufactured product," and obligates stevedores and other contractors to perform services with a reasonable level of "[c]ompetency and safety." Id. The failure to do so constitutes a breach of contract and provides shipowners with a right to indemnification for foreseeable loss resulting therefrom. Id.

Subsequent to Ryan, courts have concluded that the warranty of workmanlike performance, and the right to indemnification for a corresponding breach, also runs from a wharfinger, or dockowner, to a shipowner. See Oglebay Norton Co. v. CSX Corp., 788 F.2d 361, 365 (6th Cir. 1986); Medomsley Steam Shipping Co. v. Elizabeth River Terminals, Inc., 354 F.2d 476 (4th Cir. 1966);

14

Ammesmaki v. Interlake Steamship Co., 342 F.2d 627 (7th Cir. 1965). For example, the Sixth Circuit concluded that a wharfinger had breached its warranty of workmanlike service when the dock was strewn with wet coal and had no emergency lighting. Since the wharfinger controlled the dock, it "was under an obligation as to the shipowner to cure the dangerous conditions of the dock," and its failure to cure the conditions entitled the shipowner to indemnity under the standards enunciated in Ryan. Oglebay Norton Co., 788 F.2d at 366-67. Similarly, the Seventh Circuit held a dockowner liable to indemnify a shipowner for an injury occurring on the dock since the dockowner had breached its warranty "to maintain its dock in a reasonably safe condition." Ammesmaki, 342 F.2d at 631.

We think it clear that the warranty of workmanlike performance runs from wharfingers, such as the Port Authority, to shipowners, such as Celebrity, for whom it provides services. While the extent of the warranty is largely determined by the nature of the services undertaken by the wharfinger, the implied warranty relates to the conditions of the berths, the removal of dangerous obstructions, and the furnishing of safe means of egress and ingress to berthed ships. See Sims v. Chesapeake & Ohio Ry. Co., 520 F.2d 556, 561 (6th Cir. 1975). Here, it is undisputed that the Port Authority contracted to provide the means by which

15

passengers boarded and deboarded the M/V Century and other cruise ships. The Port Authority had total control over the operation of the passenger loading bridge and gangway. As such, it owed a duty to Celebrity and other vessel owners to ensure that the loading bridge and gangway were properly positioned. The Authority's failure to discharge this duty would constitute a breach of its warranty of workmanlike performance.

Even if it is found to have breached its duty of workmanlike performance, the Port Authority contends Celebrity is not entitled to indemnification for four reasons. We address these reasons in turn and conclude that none are persuasive.

First, the Port Authority contends that Celebrity's retention of control over the M/V Century while it was berthed precludes it from being reimbursed. See Groupe Chegaray/V. de Chalus v. P&O Containers, 251 F.3d 1359, 1371 (11th Cir. 2001) (noting "the key element" a shipowner must establish to prevail under the Ryan doctrine is the exercise of "exclusive control" by the contractor). While the Port Authority admits that it had exclusive control over the positioning and operation of the passenger bridge and gangway, it submits that "Celebrity maintained control over the gangway by virtue of the attachment" of the gangway to the ship. In other words, since the gangway was attached to the ship and Celebrity maintained control of the ship, Celebrity exercised control over the

16

gangway and cannot be heard to complain of the Port Authority's conduct.

We think the Port Authority's argument completely misses the point. The Authority had the exclusive control over the positioning and operation of the passenger loading bridge and gangway. It is the improper positioning of the bridge and gangway that is at issue. Because there is absolutely no evidence suggesting that Celebrity hindered or impeded the Port Authority in performing its function, and discharging its responsibility, of positioning the bridge and gangway in a workmanlike manner, see Le Blanc v. Two-R Drilling Co., 527 F.2d 1316, 1321 (5th Cir. 1976) (stating that to deny recovery courts must focus on "whether conduct or circumstances of the condition for which Shipowner has a legal responsibility seriously impeded or prevented Contractor from performing the job in a safe and workmanlike manner"),[18] the Port Authority's argument necessarily fails.[19]

Second, the Port Authority, like the district court, asserts that a

---

[18] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

[19] The Port Authority attempts to shore up its Celebrity-maintained-control argument by noting that Celebrity's regulations required its crew members to maintain a watch over the positioning and fastening of the gangway. The Supreme Court in Ryan, however, clearly rejected the notion that the shipowner's authority to supervise and correct a contractor's performance defeats the shipowner's claim for indemnity. Ryan Stevedoring Co., 350 U.S. at 134-35, 76 S. Ct. at 238. Accordingly, the fact that Celebrity personnel observed the positioning does not defeat its right to indemnification.

straightforward application of tort law defeats Celebrity's claim: Celebrity's negligent failure to monitor and prepare for bad weather precludes it from receiving indemnification. Celebrity's negligence or non-negligence, however, has no bearing on its right to indemnification. Celebrity's recovery for indemnity is based upon an agreement between it and the Port Authority; tort principles are therefore inapplicable. Italia Societa Per Azioini Di Navigazione v. Oregon Stevedoring Co., 376 U.S. 315, 321, 84 S. Ct. 748, 752, 11 L. Ed. 2d 732 (1964); see also Parfait v. Jahncke Service, Inc., 484 F.2d 296, 303 (5th Cir. 1973) (comparing tort indemnity with the Ryan doctrine, and noting that "indemnity under the latter does not rest on the tort concepts implicit in the former, but on a contractual warranty theory"). As the Supreme Court explained, "in the area of contractual indemnity an application of the theories of 'active' or 'passive' as well as 'primary' or 'secondary' negligence is inappropriate." Weyerhaeuser S.S. Co. v. Nacirema Operating Co., 355 U.S. 563, 569, 78 S. Ct. 438, 442, 2 L. Ed. 2d 491 (1958). Consequently, even if Celebrity were found to be negligent in its monitoring of the weather, such a finding would not preclude recovery of indemnity from the Port Authority. See Parfait, 484 F.2d at 302-03.[20]

---

[20] This is not to say that vessel negligence which seriously impedes the contractor's performance cannot defeat an indemnity recovery. See Gator Marine Service Towing, Inc., 651 F.2d 1096, 1100 (5th Cir. Unit A 1981) (concluding that "intervening vessel negligence" was of

18

Third, the Port Authority claims that our decision in Smith & Kelly Co. v. S/S Concordia TADJ, 718 F.2d 1022 (11th Cir. 1983), precludes the expansion of Ryan indemnity to the factual situation in this case. To the contrary, we view Smith & Kelly as supporting the application of Ryan indemnity here. In Smith & Kelly, a seamen was injured while at sea due to the negligence of both the shipowner and the stevedore contractor. We refused to apply the Ryan doctrine by distinguishing accidents at sea from typical pierside accidents, holding that "the original justification for Ryan indemnity [does not apply] to controversies involving seamen injured at sea." Id. at 1028. We explained that unlike accidents that occur at piers, where contractors are "better positioned to avoid injuries during cargo operations[,] . . . shipowners are best able to protect seamen from injuries aboard ship" while at sea. Id.

The case at hand involves the typical pierside accident. It also involves negligent conduct by a maritime contractor, an area where courts are especially apt to apply Ryan indemnity. Thomas J. Schoenbaum, Admiralty and Maritime Law § 6-19 (3d ed. 2001) (citing the first, third, and ninth circuits). The concerns expressed in Smith & Kelly on which the Port Authority heavily relies – a hesitation to "extend[] the Ryan-type indemnity 'beyond those controversies

such "magnitude" to defeat a Ryan indemnity claim).

19

involving the special rules governing the obligations and liability of shipowners which necessitated its formulation and justify its application.' " Smith & Kelly, 718 F.2d at 1028 (quoting Thibodeaux v. Texas E. Transmission Corp., 548 F.2d 581, 585 (5th Cir. 1977)) – are therefore unwarranted in this case.

Finally, the Port Authority contends that indemnity based upon a breach of an implied warranty of workmanlike performance is unavailable where the shipowner is seeking indemnity for damages paid to an injured passenger, instead of an injured seaman.[21] The Port Authority grounds its argument in the fact that indemnity based on a breach of workmanlike performance has historically been allowed where the shipowner is held absolutely liable for a breach of the warranty of seaworthiness owed to seamen.[22] Since passengers are not covered by the warranty of seaworthiness, Kornberg v. Carnival Cruise Lines, Inc., 741 F.2d 1332, 1335 (11th Cir. 1984), a shipowner's liability to passengers is premised on negligence and is not absolute. See id. at 1334-35. Given the fact that Celebrity is

---

[21] "A person is considered a passenger when she pays fare or other consideration for travel on a public carrier under an express or implied contract." Benedict on Admiralty § 10.04[A] (7th ed. 2002). A seaman, by contrast, is one "engaged or employed in any capacity on board a vessel . . . ." Id. at § 7.01[C][1][d][ii] (citation omitted).

[22] Under the general maritime law, shipowners are held to an implied warranty that their vessel is reasonably fit for its intended purpose. Schoenbaum, supra at § 5-9. "The duty to furnish a seaworthy vessel is absolute and nondelegable, and its breach gives rise to liability for unseaworthiness . . . ." Id. (footnote omitted).

20

not absolutely liable to Vierling, the Port Authority submits, Celebrity should be barred from indemnity.

We acknowledge that in most cases that have allowed shipowners a right to indemnity, the shipowner's liability to the injured person was absolute (and based on a breach of the warranty of seaworthiness). We also realize that language in some of our opinions suggests that Ryan indemnity is only allowed where shipowners are subject to absolute liability. See e.g., Whisenant v. Brewster-Bartle Offshore Co., 446 F.2d 394, 400, 403 n.31 (5th Cir. 1971). Even so, case law and common sense indicate that a shipowner's right to indemnification should not turn on whether the shipowner's liability to the injured person is absolute or not. As for case law, this court and the Supreme Court have already concluded that indemnity will lie even though the shipowner's liability to injured persons can be based on negligence rather than absolute liability: "even where the injured stevedore had recovered a verdict against the shipowner on grounds of negligence, not unseaworthiness, . . . the stevedoring contractor is obliged to perform with reasonable safety and to discharge foreseeable damages resulting from the contractor's improper performance, meaning indemnification of the shipowner." Grace Lines, Inc. v. Port Everglades Terminal Co., 324 F.2d 699, 701 (5th Cir. 1963) (citing Weyerhaeuser S.S. Co., 355 U.S. at 563, 78 S. Ct. at 438).

21

As for common sense, if we were to adhere to the Port Authority's view, we would countenance the untenable proposition that shipowners, such as Celebrity, are entitled to reimbursement for money paid to seamen but not for money paid to passengers, even though both seamen and passengers are hurt as a result of the same accident. Posit a situation where both a seaman and a passenger are injured simultaneously. If we adopted the Port Authority's rationale, we would require indemnification only for the damages the shipowner paid the seaman. In that the skill required to place correctly the passenger loading bridge and gangway does not vary depending on the label we attach to the persons traversing them, and that the potential harm to a person who falls as a result of a misplaced bridge and gangway is the same regardless of the person's label, it makes no sense to have different rules for different people who are injured under the same circumstances. Adopting the Authority's position would mean that the care the wharfinger exercises at a given moment would depend on who is traversing the bridge and gangway. In short, Lyons could sleep on the job as long as a person to whom Celebrity owed the duty of seaworthiness wasn't boarding the vessel.[23] Such a result would run directly afoul of the policy underpinning the Ryan doctrine that

_____

[23] Lyons could sleep on the job even though the Port Authority was charging Celebrity $5.35 for every passenger boarding the M/V Century.

"liability should fall on the party best situated to adopt preventative measures and reduce the likelihood of injury." Groupe Chegaray/V de Chalus, 251 F.3d at 1371 (internal quotation marks and citations omitted).

Thus, we see no reason why indemnity should not be awarded in proper cases when the shipowner's liability to the injured person was based on some species of fault. See William B. Daly, Jr., Contribution and Indemnity: The Quest for Uniformity, 68 Tul. L. Rev. 501, 527 (1994). A determination of whether a shipowner is entitled to indemnification should turn on whether its liability was foreseeable when the contractor performed in less than a workmanlike manner. As the Supreme Court has said, if a contractor renders a "substandard performance which led to foreseeable liability of [the shipowner], the latter was entitled to indemnity . . . ." Weyerhaeuser S.S. Co., 355 U.S. at 567, 78 S. Ct. at 441.

There is little doubt that Celebrity's liability to Vierling was foreseeable. A high degree of care is demanded of common carriers toward their passengers. McCormick v. Shipping Co., 322 F.2d 648 (5th Cir. 1963); see also Kornberg, 741 F.2d at 1334 ("A ship, as a common carrier, owes a special duty to its passengers."). Included in this high degree of care is the duty to maintain reasonable, safe means for passengers to board and disembark. Tullis v. Fidelity and Casualty Co. of New York, 397 F.2d 22, 23-24 (11th Cir. 1968). This duty is

23

nondelegable, see 14 Am. Jur. 2d Carriers § 861 (2000), and the failure of shipowners to provide such a means renders them liable in damages.[24] Martin J. Norris, The Law of Maritime Personal Injuries, § 3:13 (4th ed. 1990); see Tullis, 397 F.2d at 23-24. Considering that "[c]ourts sitting in admiralty have long recognized an obligation on the part of a carrier to furnish its passengers with a reasonably safe means of boarding and leaving the vessel," Callahan v. Cheramie Boats, Inc., 383 F. Supp. 1217, 1220 (E.D. La. 1974), that this obligation is nondelegable, and that even the "slightest negligence" renders a carrier liable, Pennsylvania Co. v. Roy, 102 U.S. 451, 456, 26 L. Ed. 141 (1880), the Port Authority certainly foresaw that Celebrity would be liable to passengers injured as a result of an improperly positioned bridge and gangway.

The hollowness of the Port Authority's position is abundantly clear. We reject it and conclude that Celebrity is entitled to indemnification if the trier of fact finds (1) that the Port Authority breached its warranty of workmanlike performance by improperly positioning the passenger loading bridge and gangway, and (2) that such breach was the cause of Vierling's injury.

---

[24] Carriers are also forbidden, as a matter of public policy, from using contracts to limit their liability for negligence to their passengers. 46 U.S.C. § 183c; Kornberg, 741 F.2d at 1335-36.

24

IV.

The district court judgment is accordingly VACATED, and the case is REMANDED for further proceedings.

SO ORDERED.