**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JACOB W. BEENTJES,
                *Plaintiff-Appellee,*

v.

PLACER COUNTY AIR POLLUTION
CONTROL DISTRICT,
                *Defendant-Appellant.*

No. 03-15598

D.C. No.
CV-00-01423-FCD

OPINION

Appeal from the United States District Court
for the Eastern District of California
Frank C. Damrell, District Judge, Presiding

Argued and Submitted
April 12, 2004—San Francisco, California

Filed February 4, 2005

Before: Warren J. Ferguson, Stephen Reinhardt, and
Richard A. Paez, Circuit Judges.

Opinion by Judge Paez

**COUNSEL**

Mathew D. Evans, James B. Car, Duncan, Ball & Evans, Sacramento, California, for the appellant.

Roderick P. Bushnell, Bushnell, Caplan & Fielding, LLP, San Francisco, CA, and Linda J. Sloven, Nevada City, California, for the appellee.

**OPINION**

PAEZ, Circuit Judge:

The Placer County Air Pollution Control District ("the District") is charged under state law with the responsibility of enforcing state and national air quality standards within its region. The District is part of the larger state and federal scheme to meet air quality standards under the federal Clean Air Act.

Jacob W. Beentjes ("Beentjes") was a former employee of the District as an air pollution control specialist. This case arose when the District terminated Beentjes after he was diagnosed with a serious pulmonary disease and efforts to accommodate his condition were unsuccessful. Beentjes sued the District alleging that the District's actions violated Title I of the Americans with Disabilities Act. Beentjes sought damages and injunctive relief.

The District ultimately moved for summary judgment on the ground that, as an arm of the state, it was entitled to sovereign immunity under the Eleventh Amendment. The district

court, employing the five-factor test that we adopted in *Mitchell v. Los Angeles Community College District*, 861 F.2d 198, 201 (9th Cir. 1988), and reaffirmed in *Belanger v. Madera Unified School District*, 963 F.2d 248, 250-51 (9th Cir. 1992), determined that the District was not entitled to sovereign immunity and denied the motion.

In this interlocutory appeal, the District challenges the district court's ruling on the ground that the court failed to recognize the District's unique status as an enforcement agency under California's implementation plan for the federal Clean Air Act. In failing to do so, the District argues that the court misapplied the *Mitchell/Belanger* five-factor test. We have jurisdiction over this interlocutory appeal under the "collateral order doctrine," *see Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1040 (9th Cir. 2003), and we affirm. We hold that the District is not an arm of the state and therefore is not entitled to sovereign immunity under the Eleventh Amendment.

I.

In 1992, Jacob W. Beentjes began working at the Placer County Air Pollution Control District as an *ex officio* employee on loan from Placer County. After being diagnosed with chronic obstructive pulmonary disease in 1997, Beentjes was terminated from his position as an air pollution control specialist. He sought an accommodation under the Americans with Disabilities Act ("ADA"), and was given another position with Placer County. He later quit this position.

Beentjes subsequently filed suit for damages and injunctive relief against the District in the Eastern District of California, alleging that the District discriminated against him on the basis of his disability and that the District failed to reasonably accommodate him, in violation of Title I of the ADA, 42 U.S.C. §§ 12101-12117. As noted above, the District moved for summary judgment on the ground that it was an arm of the state that qualified for Eleventh Amendment sovereign immu-

nity. The court denied the motion. The District then moved for reconsideration of the court's ruling. The court denied the motion for reconsideration, again ruling that the District was not entitled to sovereign immunity. The District filed a timely interlocutory appeal.

We review *de novo* a district court's ruling on a motion for summary judgment. *Holz v. Nenana City Pub. Sch. Dist.*, 347 F.3d 1176, 1179 (9th Cir. 2003). Although the District appeals from the denial of its motion for reconsideration, a ruling that we review for an abuse of discretion, the basis for the ruling was the court's determination that the District was not entitled to sovereign immunity under the Eleventh Amendment, which is a question of law that we review *de novo*. *See Savage*, 343 F.3d at 1040.

## II.

**[1]** The Eleventh Amendment of the United States Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. "The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court." *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001).

**[2]** The Supreme Court has held that "the reference to actions 'against one of the United States' encompasses not only actions in which a State is actually named as the defendant, but also certain actions against state agents and state instrumentalities." *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997); *see also Holz*, 347 F.3d at 1180. The Court, however, has "consistently refused to construe the Amendment to afford protection to political subdivisions such as counties and municipalities, even though such entities exercise a slice of state power." *Lake Country Estates, Inc. v.*

*Tahoe Reg'l Planning Agency*, 440 U.S. 391, 401 (1979) (internal quotation marks and citations omitted).

[3] The decision to extend sovereign immunity to a public entity turns on whether the entity "is to be treated as an arm of the State partaking of the State's Eleventh Amendment immunity, or is instead to be treated as a municipal corporation or other political subdivision to which the Eleventh Amendment does not extend." *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977). In the Ninth Circuit, we employ a five-factor test to determine whether an entity is an arm of the state:

> [1] whether a money judgment would be satisfied out of state funds, [2] whether the entity performs central governmental functions, [3] whether the entity may sue or be sued, [4] whether the entity has the power to take property in its own name or only the name of the state, and [5] the corporate status of the entity.

*Belanger*, 963 F.2d at 250-51 (quoting *Mitchell*, 861 F.2d at 201) (hereinafter "*Mitchell* test").[1] "We must examine these factors in light of the way California law treats the governmental agency." *Id.* at 251.

---

[1]The District suggests that this test is not suited for this case because the school districts in *Mitchell* and *Belanger* are different from enforcement agencies like air pollution control districts. The District, however, fails to explain why an entity that performs an enforcement function defies analysis under the *Mitchell* test. *Mitchell* itself held that the five factors should be used to determine whether "a *governmental agency* is an arm of the state," 861 F.2d at 201 (emphasis added), and did not distinguish school districts from entities with enforcement functions. Accordingly, we apply the *Mitchell* test to the District's claim of sovereign immunity.

## A.   State Funds

[4] The first prong of the *Mitchell* test—whether a money judgment would be satisfied out of state funds—is the predominant factor. *Id.* This factor is given additional weight because "the impetus of the Eleventh Amendment is the prevention of federal-court judgments that must be paid out of a state's treasury . . . ." *Savage*, 343 F.3d at 1041. Here, a review of the applicable state law and the funding scheme for air pollution control districts leads us to conclude that the State is not responsible for paying a money judgment against the District.

[5] First, as a "local public entity" under California law, the District, and not the State, must pay money judgments against it. California Health & Safety Code § 40707 provides that all claims for money damages against air pollution control districts are governed by Parts 3 and 4 of Division 3.6 of the California Government Code, §§ 900-962, which pertain to claims and actions against public entities. In turn, the definitional provisions of Part 3 of Division 3.6 of the Government Code (1) define a "local public entity" to include a "district," (2) distinguish a "local public entity" from "the State," and (3) specify that the "State" is responsible for paying money judgments against the State. Cal. Gov't Code § 900.4 (providing that a "local public entity" includes "a county, city, *district*, public authority, public agency, and any other political subdivision or public corporation in the State, *but does not include the State*") (emphasis added); *id.* § 900.6 (defining "State" as "the State and any office, officer, department, division, bureau, board, commission or agency of the State *claims against which are paid by warrants drawn by the Controller*") (emphasis added). Taken together, these provisions establish that under California law, local public entities, including air pollution control districts, are responsible for paying their own money judgments.

This conclusion is bolstered by additional provisions of the Government Code pertaining to the payment of judgments

against local public entities. *See id.* § 970 (" 'Local public entity' includes a county, city, *district*, public authority, public agency, and any other political subdivision or public corporation in the state, but *does not include . . .* the state or any office, officer, department, division, bureau, board, commission or agency of the state *claims against which are paid by warrants drawn by the Controller.*") (emphasis added); *id.* § 970.2 (providing that "[a] local public entity shall pay any judgment in the manner provided in this article" and giving a judgment creditor the right to obtain a writ of mandate to compel a local public entity to pay a judgment against it).

Although the District does not dispute that it must pay a judgment obtained against it, the District emphasizes that it has two million dollars in liability insurance coverage that would suffice to satisfy a judgment in this case. However, "it is the entity's potential legal liability, rather than its ability or inability to require a third party to reimburse it, or to discharge the liability in the first instance, that is relevant." *Regents of the Univ. of Cal.*, 519 U.S. at 431.

Nonetheless, the District claims that a money judgment against it would be paid out of state funds because "state revenue" constitutes a significant portion of the District's annual budget, from which it pays its insurance premiums. This claim is misleading, however, because the bulk of the monies demarcated as "state revenue" in the District's annual budget comes from a vehicle surcharge that does not actually represent state funds. Although this surcharge is collected by the State through the Department of Motor Vehicles, *see* Cal. Health & Safety Code § 44227, it is imposed at the discretion of the District, levied against vehicles registered within the District, and returned to the District to further its goal of reducing air pollution. *See id.* §§ 40701.5(a)(5), 44223, 44229. The district court properly determined that the "state vehicle surcharge" is more appropriately considered a local tax.

Further, a former District officer testified that the next-largest source of District revenue, the "Air Toxics 'Hot Spots' Information and Assessment Act,"[2] is taken from local industries and therefore is not state funding. Taking these undisputed facts into account, between 1994 and 1999, local funds accounted for the vast majority of the District's annual budget, while funds from the state treasury comprised no more than 10% of its annual budget.

The District, relying on *Belanger*, argues that local funds that are commingled with (even a small amount of) state funds should no longer be deemed local in nature. *See Belanger*, 963 F.2d at 252 (holding that a judgment against a school district would be satisfied from state funds). State funds, however, comprised 75% of the school district's budget in *Belanger*, *id.* ("[T]he bulk of the school district's budget comes directly from the state school fund . . . ." ), whereas here they accounted for only a small percentage of the District's budget.

In addition, in *Belanger* we emphasized that the State of California exerts substantial control over the budgets of school districts. For example, the State imposes a revenue limit for each school district, determines the maximum amount of funding each district receives (and spends on students), and provides the necessary funds. *Id.* Therefore, "it was not commingling per se,"[3] but rather the unique level of state control over the budgets of school districts that led us to conclude in *Belanger* that local funds were interchangeable with state funds. *Id.* In *Belanger*, it was the fact that "the state controlled the budget and would be required to make up any

---

[2]*See* Cal. Health & Safety Code §§ 44300-44394.

[3]Were commingling of funds the only requirement for immunity from suit, there would be few limits to the doctrine of sovereign immunity. *See Savage*, 343 F.3d at 1041 ("[I]f mere commingling were enough to bestow governmental agency status upon the School District, then it would also be an arm of the federal government, as well as an arm of the [County].").

budgetary shortfalls" that made the state treasury vulnerable. *Savage*, 343 F.3d at 1042. By contrast, the District is required by California law to turn to *local cities and counties*, and not the State of California, to make up any budgetary shortfalls. Cal. Health & Safety Code § 40701.5(b) (stating that expenses not met by funding sources shall be provided by an assessment on cities that have a member on the district board and on counties within the district); *see also id.* § 40101(a)(1) (explaining that an air pollution control district's funds may be appropriated from local counties and deposited in the district treasury).

Moreover, the District has the discretion to replenish its budget by leasing, selling, or disposing of any property that it no longer uses and paying any resulting proceeds into the District's general fund. *Id.* § 40701(e). With the authority to raise its own funds, the District bears a closer resemblance to the entities in *Holz* and *Mt. Healthy* than the school district in *Belanger*. In *Holz*, the fact that Alaska provided a set amount of state funds to local school districts suggested that the school districts could supplement those funds with their own revenues and, therefore, that a money judgment would not necessarily be paid with state funds. 347 F.3d at 1184. In *Mt. Healthy*, the Supreme Court held that the local school board was not an arm of the state, despite receiving a significant amount of money from the State of Ohio, because it had extensive powers to issue bonds and to levy taxes. 429 U.S. at 280; *see also Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 45 (1994) (noting the fact that the Port Authority generated its own revenues in concluding that it was not an arm of the state); *Vierling v. Celebrity Cruises, Inc.*, 339 F.3d 1309, 1315 (11th Cir. 2003) (holding that an entity that was "financially self-sufficient, generate[d] its own revenues, and pa[id] its own debts" was not an arm of the state). The authority to raise independent revenue is a relevant consideration because "the fact that the state has given the entity the authority to generate revenue provides compelling evidence that the state has created an autonomous entity rather than an alter ego

or instrumentality that operates at the state's behest and relies exclusively on state appropriations." Alex E. Rogers, Note, *Clothing State Governmental Entities with Sovereign Immunity: Disarray in the Eleventh Amendment Arm-of-the-State Doctrine*, 92 Colum. L. Rev. 1243, 1308 (1992).

The District finally argues that, even if it has other sources of funding, the State of California is ultimately responsible in the event that a money judgment threatens the District's survival. The District relies on two cases in which we held that the first *Mitchell* factor weighed in favor of finding sovereign immunity even though the state was not *legally* responsible for a money judgment against the entity. *See Aguon v. Commonwealth Ports Auth.*, 316 F.3d 899, 902-04 (9th Cir. 2003) (concluding that the Commonwealth Ports Authority (CPA) was an arm of the Commonwealth of the Northern Mariana Islands even though the Commonwealth was "not directly liable for a judgment against the CPA")[4]; *Alaska Cargo Transp., Inc. v. Alaska R.R. Corp.*, 5 F.3d 378, 380, 382 (9th Cir. 1993) (holding that a state-run railroad was an arm of the state despite a state law providing that the railroad, and not the state, was liable for a judgment against it).[5]

---

[4]Although Eleventh Amendment sovereign immunity was not directly at issue in *Aguon*, we applied the *Mitchell* test to guide our analysis of whether the CPA was a "person" subject to suit under 42 U.S.C. § 1983. *Aguon*, 316 F.3d at 901-02.

[5]In both *Aguon* and *Alaska Cargo*, we considered the first *Mitchell* factor together with the second—whether the entity performs a central governmental function—and concluded that the State was the "real, substantial party in interest" despite the fact that it was not *legally* obligated to satisfy a judgment against the entity. *Aguon*, 316 F.3d at 902 (stating that "we cannot divorce the second *Mitchell* factor . . . from our assessment of the first factor" in determining whether the Commonwealth, though not directly liable for a judgment against the CPA, was nonetheless the real party in interest (quoting *Alaska Cargo*, 5 F.3d at 380)); *Alaska Cargo*, 5 F.3d at 380 ("[W]e cannot divorce the second *Mitchell* factor, the governmental function [the railroad] performs, from our assessment of the first factor, which is the impact on the State of Alaska of a judgment against [the railroad].").

In *Alaska Cargo*, however, we relied on a state statute that *required* the railroad to seek funding from the state legislature if a particular service was not self-sustaining. 5 F.3d at 381. Furthermore, "[w]e emphasized the unique role of the Alaska Railroad as the 'life-support system for thousands of Alaskans' that made it a central governmental function.' " *Holz*, 347 F.3d at 1184 (quoting *Alaska Cargo*, 5 F.3d at 381). Likewise, in *Aguon*, we noted that the Commonwealth would be forced to pay an unsatisfied money judgment against the CPA "to protect its island economy" because the CPA provided "essential seaport and airport services." *Aguon*, 316 F.3d at 903. We also noted that the function of the CPA in the Commonwealth was "equally indispensable to the role of [the railroad] in Alaska." *Id.* at 902.

[6] Unlike in *Alaska Cargo* and *Aguon*, here the first *Mitchell* factor weighs against a finding of sovereign immunity because the District "is not a single, unique entity upon which a great part of the state depends for its lifeline, and there is no comparable structure of compulsion thrusting the State into the role of real, substantial party in interest." *Holz*, 347 F.3d at 1185 (distinguishing the railroad at issue in *Alaska Cargo* from the public school district at issue in *Holz*). We held in *Holz* that in the absence of a showing that money used to pay a judgment will necessarily be replaced with state funds, "we adhere to our basic proposition that 'the fact that the state may ultimately *volunteer* to pay the judgment . . . is immaterial; the question is whether the state treasury is legally obligated' " to do so. *Id.* (quoting *Durning v. Citibank, N.A.*, 950 F.2d 1419, 1425 n.3 (9th Cir. 1991) (internal quotation marks omitted) (emphasis in original)). Because here, the applicable state law provides that the State has no legal obligation to pay a money judgment against the District, and because there is no evidence that the State would replace funds used to satisfy a judgment,[6] the first *Mitchell* factor—the one given most

---

[6]In its discovery responses, the District stated that it did not know whether it had a right of reimbursement from the State in the event that it was required to pay a judgment against it, because the District would first seek reimbursement from the county.

weight—favors a finding that the District is not an arm of the state.

## B. Central Governmental Function

**[7]** In assessing the second *Mitchell* factor—whether the entity performs a central governmental function—we evaluate whether the District addresses "a matter of statewide rather than local or municipal concern," *see Belanger*, 963 F.2d at 253, and "the extent to which the state exercises centralized governmental control over the entity." *Savage*, 343 F.3d at 1044. The District contends that it performs a central governmental function because it was created by the State of California to enforce statewide and nationwide air pollution standards.

It is true that air pollution control districts are the mechanism through which the State meets and maintains state and federal air quality standards under the federal Clean Air Act and California law. *See* 42 U.S.C. §§ 7407(a) & 7410(a)(1) (requiring each state to submit a plan specifying how it will achieve and maintain national air quality standards in each air quality control region within the state); Cal. Health & Safety Code § 39602 (designating the California Air Resources Board ("the Board") as the state agency responsible for preparing the implementation plan required by the Clean Air Act); *Id.* §§ 40001-40002, 40702 (establishing air pollution control districts and empowering them to adopt and enforce rules and regulations designed to meet and maintain state and federal air quality standards within their jurisdictions).[7]

---

[7]Although the District is a state creation, *see* 42 U.S.C. § 7401(b)(4); Cal. Health & Safety Code §§ 40000-41133, an entity is not automatically entitled to sovereign immunity merely because it was created by the State. "[U]ltimate control of every state-created entity resides with the State, for the State may destroy or reshape any unit it creates. Political subdivisions exist solely at the whim and behest of the State, yet cities and counties do not enjoy Eleventh Amendment immunity." *Hess*, 513 U.S. at 47 (internal quotation marks omitted).

**[8]** While air pollution control districts form a key part of this larger state and federal regulatory framework, they nonetheless have a highly localized function. Although the California Air Resources Board, a state agency, coordinates the activities of air pollution control districts that are necessary to comply with the Clean Air Act, *id.* § 39602, the Board's limited oversight role over districts does not support the District's contention that it is merely an enforcement agency of the Board and therefore performs a central governmental function. Indeed, the California Legislature has declared that "[l]ocal and regional authorities have the *primary* responsibility for control of air pollution from all sources other than vehicular sources." *Id.* § 39002 (emphasis added); *see also id.* § 40000 (same). The Legislature also has declared that "[s]ince air pollution knows no political boundaries, . . . a regional approach to the problem should be encouraged whenever possible . . . ." *Id.* § 39001. As the California Supreme Court has explained, "Local and regional boards will be more familiar with local conditions, both environmental and economic, than the Board. . . . Thus the districts are asked to evaluate the economic consequences of air quality regulation in specific local situations where concrete relevant evidence may be presented." *Western Oil & Gas Ass'n v. Air Res. Bd.*, 691 P.2d 606, 619 (Cal. 1984). In sum, although the prevention of air pollution is a matter of statewide concern, air pollution control districts perform primarily local governmental functions. *See Lynch v. San Francisco Hous. Auth.*, 65 Cal. Rptr. 2d 620, 627 (Cal. Ct. App. 1997) (noting that local housing authorities "admittedly address matters of concern to the state . . . but in doing so they function within, and are concerned with, a limited geographic area").[8]

---

[8]The District argues that "[a]ir pollution prevention falls under the broad police powers of the states," and that the delegation of this important power to an air pollution control district makes it an arm of the state. The fact that an entity has enforcement or police powers, however, does not immunize it from suit. As the district court pointed out, municipalities, even though they often carry out or enforce state rules and regulations, are not entitled to sovereign immunity.

In addition to performing a primarily local function, air pollution control districts are entrusted with a variety of discretionary powers and have substantial autonomy in carrying out their duties.[9] For instance, they may adopt their own rules and budgets, establish their own regulatory systems for reducing air contaminants, issue abatement orders, and bring actions to assess civil penalties against individuals who violate air pollution regulations. *See* Cal. Health & Safety Code §§ 40702, 40709, 40131, 42403, 42450. Districts also may delegate any functions related to implementing transportation control measures to any local agency. *Id.* § 40717(e).

Further, just as California is allowed to implement air qual-

---

Indeed, the fact that an entity provides a valuable public service does not make it an arm of the state. As the Supreme Court has explained:

> A charitable organization may undertake rescue or other good work which, in its absence, we would expect the State to shoulder. But none would conclude, for example, that in times of flood or famine the American Red Cross, to the extent it works for the public, acquires the States' Eleventh Amendment immunity.

*Hess*, 513 U.S. at 50 (footnote omitted) (rejecting the argument that the Port Authority is immune from suit because it supports public projects that the State would otherwise have to finance).

[9]Although the *Mitchell* test does not explicitly discuss the concept of autonomy, we previously have incorporated this principle into the "central governmental function" prong. *See, e.g.*, *Savage*, 343 F.3d at 1044 (noting that in analyzing the second *Mitchell* factor "we assess the extent to which the state exercises centralized governmental control over the entity" and concluding that Arizona school districts had "enormous autonomy in the management of public education"). Moreover, the consideration of local autonomy as a factor in our analysis is consistent with the practice of other circuits. *See, e.g.*, *S.J. v. Hamilton County*, 374 F.3d 416, 420 (6th Cir. 2004) (considering as one factor "what degree of control the state maintains over the entity"); *Vierling*, 339 F.3d at 1314 (considering as one factor "what degree of control the state maintains over the entity"); *Wojcik v. Mass. State Lottery Comm'n*, 300 F.3d 92, 101 (1st Cir. 2002) (assessing, among other things, "whether the state exerts control over the agency, and if so, to what extent"); *Southwestern Bell*, 243 F.3d at 939 (same).

ity standards that are more stringent than federal requirements, *see* 42 U.S.C. § 7416, regional and local districts have discretion to promulgate and enforce air quality standards that are more stringent than state requirements. *See* Cal. Health & Safety Code § 41508. Air pollution control districts also have the discretion to balance statewide environmental concerns with potential local economic consequences by granting variances below state standards. *Id.* § 42350; *Western Oil*, 691 P.2d at 618.

**[9]** In light of the decentralized structure of air quality enforcement in California, as well as the degree of autonomy enjoyed by local air pollution control districts, we agree with the district court that "while districts derive their authority from the State, they are granted wide latitude to conduct their affairs as they see fit, so long as they maintain standards at least as stringent as those adopted by the State." In short, the District does not perform a central governmental function and this second prong of the *Mitchell* test favors a finding that the District is not an arm of the state.[10]

---

[10]The District argues that it should be considered an arm of the state because we recognized in *United States v. Price* that an analogous district in Nevada acted under "state" authority when enforcing air pollution regulations. 314 F.3d 417, 421 (9th Cir. 2002). *Price* is inapposite, however. There, we applied the separate sovereign doctrine to determine that the Double Jeopardy Clause did not bar Price's prosecution for a violation of the Clean Air Act even though the local district had levied a fine against Price for the same conduct. *Id.* Determining that an entity acts under the authority of a state as opposed to the federal government in the context of the Double Jeopardy Clause is far different from holding that the entity is an arm of the state under the Eleventh Amendment. Thus, our holding in *Price* does not compel a finding that the District here enjoys sovereign immunity. *Cf. Edelman v. Jordan*, 415 U.S. 651, 668 n.12 (1974) (noting that "while county action is generally state action for purposes of the Fourteenth Amendment, a county defendant is not necessarily a state defendant for purposes of the Eleventh Amendment").

The District also cites *Sherwin-Williams Co. v. South Coast Air Quality Mgmt. Dist.*, 104 Cal. Rptr. 2d 288, 302 (Cal. Ct. App. 2001), for the proposition that California law considers an air quality management district

## C.   Power to Sue or Be Sued

**[10]** An entity's power to sue or be sued weighs against a finding of Eleventh Amendment immunity. *Belanger*, 963 F.2d at 254. It is undisputed that California law provides that "[a] district shall have power . . . [t]o sue and be sued in the name of the district in all actions and proceedings in all courts and tribunals of competent jurisdiction." Cal. Health & Safety Code § 40701(b). In addition, state law specifically contemplates that claims for damages may be brought against air pollution control districts. *See id.* § 40707 (providing that "claims for money or damages against a district are governed by" provisions in the California Government Code pertaining to claims and actions against public entities). And at least one California court has allowed a damages lawsuit against an air pollution control district. *See Colusa Air Pollution Control Dist. v. Superior Court of Los Angeles County*, 277 Cal. Rptr. 110, 112-13 (Cal. Ct. App. 1991) (holding that an air pollution control district was properly joined as a defendant in an environmental lawsuit seeking, among other relief, monetary damages). Although this third factor of the *Mitchell* test is not dispositive, it clearly favors a finding that the District is not an arm of the state.

## D.   Power to Take Property in its Name

**[11]** California law also authorizes the District to "take by grant, purchase, gift, devise, or lease, to hold, use, and enjoy, and to lease or dispose of any real or personal property within or without the district necessary to the full exercise of its

_____

(and therefore, an air pollution control district) a "state agency." This is a mischaracterization of *Sherwin-Williams*, however, which used the phrase "state agency" only in its statement of the standard of review in environmental agency cases. Leaving aside the fact that *Sherwin-Williams* never addressed sovereign immunity, it is obvious that "[l]abeling an entity as a 'state agency' in one context does not compel treatment of that entity as a 'state agency' in all contexts." *Lynch*, 65 Cal. Rptr. 2d at 623.

powers." Cal. Health & Safety Code § 40701(d). A district even may use the proceeds from property transactions to replenish its general fund. *See id.* § 40701(e). This factor also weighs in favor of finding that the District is not an arm of the state.

## E.   Corporate Status

[12] "The final *Mitchell* factor is concerned with the extent to which . . . an entity [is] distinct from the state." *Holz*, 347 F.3d at 1188. Here, California law defines an air pollution control district as "a body corporate and politic and a public agency of the State." Cal. Health & Safety Code § 40700. On the one hand, the characterization of a district as a body corporate implies that the District has a corporate status separate from the State of California. *See Durning v. Citibank, N.A.*, 950 F.2d 1419, 1427 (9th Cir. 1991) (holding that a state law defining a community development authority as "body corporate operating as a state instrumentality" indicated that it had "its own independent corporate identity"). On the other hand, the designation of a district as "a public agency of the State" suggests that it may not have a separate identity. Nonetheless, as noted above, under the California Government Code, a "district" is included in the definition of a "local public entity," and a "local public entity" is specifically distinguished from "the State." Cal. Gov't Code § 900.4 (providing that a "local public entity" includes "a county, city, district, public authority, public agency, and any other political subdivision or public corporation in the State, but does not include the State"); *see also id.* § 900.6 (defining "State" as "the State and any office, officer, department, division, bureau, board, commission or agency of the State claims against which are paid by warrants drawn by the Comptroller").[11]

---

[11]*See also Moor v. County of Alameda*, 411 U.S. 693, 719-21 (1973) (noting that provisions of California law designating a county as a "body corporate and politic" and defining a county as a "local public entity" in contrast to the State were "persuasive indicia of the independent status" of counties relative to the State, leading to the conclusion that Alameda County had a "sufficiently independent corporate character" to warrant its treatment as a citizen of the state for purposes of diversity jurisdiction).

The District's independent corporate status is also evident in its system of governance. California law provides that the governing board of any air pollution control district shall be comprised of mayors, city council members, and county supervisors — as jointly determined by member counties and cities — and shall reflect the geographic diversity of the region. *See* Cal. Health & Safety Code § 40704.5; *cf. Aguon*, 316 F.3d at 903-04 (noting that the Commonwealth Ports Authority had a Commonwealth-appointed board of directors and a governor-appointed director); *Alaska Cargo*, 5 F.3d at 381-82 (noting that the governor appointed all seven members of the railroad's board); *Wojcik*, 300 F.3d at 101 (noting that the governor had power of approval over the Lottery Commission's director and power of appointment over the Commission's governing officials).

**[13]** In terms of day-to-day governance, the District's governing board determines the number of personnel it employs and how much it pays employees. Cal. Health & Safety Code §§ 40705, 40706. County officers and employees are expected to work *ex officio* for the district, as they would for the county, without additional compensation. *Id.* § 40120. As the district court properly noted, "the State exercises little control over the structure and operation of the districts, which suggests that districts function independently from the State"; *see also Williams*, 242 F.3d at 321 (refusing to extend sovereign immunity to a regional transportation authority whose executive committee consisted of members appointed by municipalities and whose "day-to-day operations . . . fall under purely local control"). Therefore, this fifth factor also favors a finding that the District is not an arm of the state.

\* \* \* \*

**[14]** In sum, all five of the *Mitchell* factors lead to the conclusion that California's air pollution control districts are not instrumentalities of the State entitled to sovereign immunity under the Eleventh Amendment. Accordingly, we affirm the

district court's rulings denying the District's motions for summary judgment and reconsideration.

**AFFIRMED.**