**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| TRINA RAY, individually, and on behalf of others similarly situated, *Plaintiff-Appellee*, v. COUNTY OF LOS ANGELES, *Defendant-Appellant*. | No. 17-56581 D.C. No. 2:17-cv-04239-PA-SK |

| | |
|---|---|
| TRINA RAY; SASHA WALKER, individually, and on behalf of all others similarly situated, *Plaintiffs-Appellants*, v. LOS ANGELES COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, Erroneously Sued As County of Los Angeles, *Defendant-Appellee*. | No. 18-55276 D.C. No. 2:17-cv-04239-PA-SK OPINION |

Appeal from the United States District Court
for the Central District of California
Percy Anderson, District Judge, Presiding

Argued and Submitted March 7, 2019
Pasadena, California

Filed August 22, 2019

Before:  Kim McLane Wardlaw and Mark J. Bennett,
Circuit Judges, and Kathleen Cardone,[*] District Judge.

Opinion by Judge Bennett

## SUMMARY[**]

### Labor Law / Eleventh Amendment Immunity

The panel affirmed the district court's order denying a defendant county's motion to dismiss, on Eleventh Amendment immunity grounds, a putative collective action under the Fair Labor Standards Act; reversed the district court's order regarding the putative collective period; and remanded.

Plaintiff homecare providers were employed through California's In-Home Supportive Services program, which is implemented and run by the State and its counties. In October 2013, the Department of Labor promulgated a new rule providing that homecare providers would be entitled to overtime pay under the FLSA. The final rule had an

---

[*] The Honorable Kathleen Cardone, United States District Judge for the Western District of Texas, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

effective date of January 1, 2015. In 2014, the District Court for the District of Columbia vacated the rule. On August 21, 2015, the D.C. Circuit reversed and ordered the district court to enter summary judgment for the Department of Labor. On September 14, 2015, the Department of Labor announced that it would not bring enforcement actions against any employer for violations of the new rule for 30 days after issuance of the mandate of the D.C. Circuit. On October 27, 2015, the Department of Labor said it would not begin enforcing the new rule until November 12, 2015. The State began paying overtime wages on February 1, 2016.

Affirming in part, the panel held that the County of Los Angeles was not entitled to Eleventh Amendment immunity. The panel assumed without deciding that a county might be entitled to immunity if acting as an arm of the state. The panel held that, under the five-part *Mitchell* test, the County was not an arm of the State when it administered the IHSS program because the state-treasury factor, which is the most important, and all but one of the other *Mitchell* factors weighed against immunity. The panel held that a later Supreme Court case, *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30 (1994), did not undermine *Mitchell* such that it should be overruled.

Reversing in part, the panel held that the effective date of the Department of Labor's rule was January 1, 2015, because the legal effect of the D.C. Circuit's vacatur was to reinstate the original effective date. The panel held that the Department of Labor's choice against enforcing the rule until November 12, 2015, did not eliminate the availability of private rights of action until that date. Accordingly, the beginning of the putative collective period was January 1, 2015.

**COUNSEL**

Jennifer Mira Hashmall (argued) and Jeffrey B. White, Miller Barondess LLP, Los Angeles, California, for Defendant-Appellant/Cross-Appellee.

Matthew C. Helland (argued) and Daniel S. Brome, Nichols Kaster LLP, San Francisco, California; Philip Bohrer, Bohrer Brady LLC, Baton Rouge, Louisiana; for Plaintiff-Appellee/Cross-Appellants.

**OPINION**

BENNETT, Circuit Judge:

This case concerns whether a county is an arm of the state and thus entitled to Eleventh Amendment immunity when it shares responsibility with the state for implementing a state-wide homecare program. We also consider the effective date of regulations that (1) a district court vacated before their original effective date; (2) an appellate court upheld, reversing the district court; and (3) the agency then decided not to enforce until a date after the original effective date. We agree with the district court that the County of Los Angeles is not entitled to Eleventh Amendment immunity but disagree as to the effective date of the regulations, which we hold is the original effective date of January 1, 2015. We thus affirm in part, reverse in part, and remand.

**FACTS**

California's In-Home Supportive Services program ("IHSS program" or "the program") provides in-home supportive services to eligible low-income elderly, blind, or disabled persons. Homecare providers help recipients with

daily activities like housework, meal preparation, and personal care. The program serves hundreds of thousands of recipients. In the County of Los Angeles alone there are about 170,000 homecare providers and more than 200,000 recipients. California implements the program through regulations promulgated by the California Department of Social Services (CDSS), and the program is administered in part by California counties. Plaintiffs are current or former Los Angeles IHSS homecare providers.

The State and its counties share responsibility for implementing and running the IHSS program. The CDSS ensures that "in-home supportive services [are] provided in a uniform manner in every county," Cal. Welf. & Inst. Code § 12301(a), and it must "adopt regulations establishing a uniform range of services available to all eligible recipients based upon individual needs," *id.* § 12301.1(a). The State also procures and implements a "Case Management Information and Payroll System." *Id.* § 12317(b).

But counties have some oversight of the IHSS program as well. They, like the State, may terminate homecare providers. *See id.* § 12300.4(b)(5). And counties evaluate recipients and ensure quality compliance. *See id.* § 12301.1. Counties also "ensure that services are provided to all eligible recipients." *Id.* § 12302. Plaintiffs claim that although they receive paychecks from the State, the County is responsible for a "share" of their wages. For example, if a county imposes "any increase in provider wages or benefits [that] is locally negotiated," then "the county shall use county-only funds" to fund that increase. *Id.* § 12306.1(a). Each county also determines whether its providers may exceed the maximum number of hours set by the CDSS. *See id.* § 12300.4(d)(3).

As employers of the homecare providers, the State and County must comply with the Fair Labor Standards Act's (FLSA) overtime wage requirements. *See* 29 U.S.C. § 207(a)(1). But that wasn't always the case.

In 1974, Congress created a "companionship exemption" to the FLSA for employees "employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves." *See id.* § 213 (a)(15); Fair Labor Standards Amendments of 1974, Pub. L. No. 93-259, 88 Stat. 55. This exemption applied to homecare providers like Plaintiffs.

In October 2013, however, the Department of Labor (DOL) promulgated a new rule that changed the definition of "companionship services" so that homecare providers like Plaintiffs would be entitled to overtime pay under the FLSA. *See* Application of the Fair Labor Standards Act to Domestic Service, 78 Fed. Reg. 60,454, 60,454 (Oct. 1, 2013) (codified at 29 C.F.R. pt. 552). The final rule had an effective date of January 1, 2015. *See id.*

Before the rule's effective date, a group of "trade associations that represent businesses employing workers" subject to the FLSA exemption filed a lawsuit in the District Court for the District of Columbia. *See Home Care Ass'n of Am. v. Weil*, 76 F. Supp. 3d 138, 142 (D.D.C. 2014) (*Weil I*). The plaintiffs claimed that the rule was arbitrary and capricious and thus sought to enjoin its implementation. *Id.* at 139. At step one of its *Chevron* analysis, the district court found that Congress had "clearly spoken" on the issue. *Id.* at 146. The district court then vacated the rule, *id.* at 148, and the DOL appealed.

On August 21, 2015, the D.C. Circuit reversed and ordered the district court to enter summary judgment for the DOL. *Home Care Ass'n of Am. v. Weil*, 799 F.3d 1084, 1087 (D.C. Cir. 2015) (*Weil II*). Although the DOL prevailed, on September 14, 2015 it announced that it would "not bring enforcement actions against any employer for violations of FLSA obligations resulting from the amended domestic service regulations for 30 days after the date the mandate issues."[1] Application of the Fair Labor Standards Act to Domestic Service; Announcement of 30-Day Period of Non-Enforcement, 80 Fed. Reg. 55,029, 55,029 (Sept. 14, 2015) (codified at 29 C.F.R. pt. 552). The *Weil II* mandate issued on October 13, 2015.

On October 27, 2015, the DOL said that it would not begin enforcing the final rule until November 12, 2015.

---

[1] The DOL also stated:

> This 30-day non-enforcement policy does not replace or affect the timeline of the Department's existing time-limited non-enforcement policy announced in October 2014. 79 FR 60974. Under that policy, through December 31, 2015, the Department will exercise prosecutorial discretion in determining whether to bring enforcement actions, with particular consideration given to the extent to which States and other entities have made good faith efforts to bring their home care programs into compliance with the FLSA since the promulgation of the Final Rule. The Department will also continue to provide intensive technical assistance to the regulated community, as it has since promulgation of the Final Rule.

Application of the Fair Labor Standards Act to Domestic Service; Announcement of 30-Day Period of Non-Enforcement, 80 Fed. Reg. at 55,029.

And, echoing its September 14, 2015 statement, the DOL again said that

> from November 12, 2015 through December 31, 2015, [it would] exercise prosecutorial discretion in determining whether to bring enforcement actions, with particular consideration given to the extent to which States and other entities have made good faith efforts to bring their home care programs into compliance with the FLSA since the promulgation of the Final Rule.

Application of the Fair Labor Standards Act to Domestic Service; Dates of Previously Announced 30-Day Period of Non-Enforcement, 80 Fed. Reg. 65,646, 65,646 (Oct. 27, 2015) (codified at 29 C.F.R. pt. 552).

Before the *Weil I* decision, California (through the CDSS) began taking steps to "meet the January 1, 2015, implementation date," including modifying its systems to "process and calculate overtime compensation." But after the *Weil I* decision, the CDSS decided that it would not implement overtime payments "until further notice." After *Weil II*, the CDSS again said that it would comply with the overtime requirements—but not until February 1, 2016.

In June 2017, Ray filed a putative collective action,[2] under Section 216(b) of the FLSA, against the State of California and the County of Los Angeles. Ray's complaint sought relief for herself and the putative collective for

---

[2] Collective actions are provided for in the FLSA and are different from class actions, *see Campbell v. City of L.A.*, 903 F.3d 1090, 1101 (9th Cir. 2018), but the differences are not relevant to this appeal.

unpaid overtime wages between January 1, 2015—the rule's original effective date—and February 1, 2016, the date on which the State began paying overtime wages.

As relevant here, the County moved to dismiss the complaint on Eleventh Amendment immunity grounds.[3] In the alternative, the County moved to strike all references in the complaint to overtime wages allegedly earned before October 13, 2015—the date on which the mandate issued in *Weil II*.

The district court first held that the County had no Eleventh Amendment immunity. The district court noted that the Supreme Court has long refused to grant Eleventh Amendment immunity to counties and that the Court has already held that California counties are not arms of the State. The district court then assumed *arguendo* that a county could be an arm of the State under the five-factor test that we set out in *Mitchell v. Los Angeles Community College District*, 861 F.2d 198 (9th Cir. 1988) for determining whether an entity is an arm of the state for purposes of Eleventh Amendment immunity. The district court found that only one of the five factors favored the County, and thus it held that the County enjoyed no Eleventh Amendment immunity.

The district court then "reject[ed] Plaintiffs' efforts to enforce the FLSA companionship exemption regulations retroactively to January 1, 2015." Instead, it held "that the putative collective period extends from November 12, 2015, through January 31, 2016," and not before. The court said

---

[3] Early on, Ray voluntarily dismissed the CDSS as a defendant, and Plaintiffs did not name the State as a defendant in the now-operative complaint.

that although the *Weil II* decision applied retroactively, that decision was merely that the DOL could amend the FLSA and that those amendments were not arbitrary and capricious. This, the district court held, differed from "the retroactive application of the amended regulations themselves." The district court reasoned:

> The rule of law announced by the D.C. Circuit is given retroactive effect by allowing DOL to reinstate those regulations without having to begin a new rule-making process. That is not the same thing as reinstating an earlier and judicially vacated effective date and retroactively creating liability for violations of the reinstated regulations as if the District Court's vacation of the regulations had never occurred.

The district court also found it "compelling" that both the D.C. Circuit and the DOL "intended" that the regulation become effective "no earlier than November 12, 2015." As evidence of this intent, the district court pointed to the DOL's decision not to enforce the new regulations before that date.

Finally, the district court found that its holding was consistent "with the general rule that a private right of action should ordinarily not exist when the applicable rule could not be enforced by the relevant enforcement agency."

The County filed an interlocutory appeal as to the denial of Eleventh Amendment immunity. The district court granted Plaintiffs' motion to certify for interlocutory appeal the district court's holding that the putative collective period began on November 12, 2015, and we granted Plaintiffs' request to appeal that holding.

## DISCUSSION

We review de novo the denial of Eleventh Amendment immunity. *Cal. ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831, 843 n.12 (9th Cir. 2004). We construe the motion to strike as a motion to dismiss in part, and thus we review the effective date holding de novo because it essentially dismissed Plaintiffs' overtime claims for the period between January 1, 2015 and November 12, 2015. *See Yamaguchi v. U.S. Dep't of the Air Force*, 109 F.3d 1475, 1482 (9th Cir. 1997).

### A. The County is not entitled to Eleventh Amendment immunity.

Plaintiffs first argue that Eleventh Amendment immunity is never available to counties. The County argues that it enjoys Eleventh Amendment immunity when acting as an "arm of the State."

Federal courts have long declined to extend Eleventh Amendment immunity to counties.[4] Indeed, the Supreme

---

[4] *See, e.g.*, *Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 401 (1979) ("[T]he Court has consistently refused to construe the Amendment to afford protection to political subdivisions such as counties and municipalities, even though such entities exercise a slice of state power." (internal quotation marks omitted)); *Lincoln Cty. v. Luning*, 133 U.S. 529, 530 (1890) (holding that the Eleventh Amendment does not bar a suit against a county, though the principle advanced has changed over time); *Del Campo v. Kennedy*, 517 F.3d 1070, 1075–76 (9th Cir. 2008) ("State sovereign immunity . . . does not extend to counties and similar municipal corporations, even though they share some portion of state power." (internal quotation marks omitted) (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977))).

Court once said that Eleventh Amendment immunity does not extend to municipal corporations. *Mt. Healthy*, 429 U.S. at 280. But thirty years later, the Supreme Court suggested that it was at least possible for a county to receive Eleventh Amendment immunity. In *Northern Insurance Company of New York v. Chatham County*, 547 U.S. 189, 190 (2006), which involved a county-operated drawbridge, the Court stated that a county might be entitled to Eleventh Amendment immunity if it were "acting as an arm of the State, as delineated by this Court's precedents, in operating the drawbridge."**[5]**

The Court cited several cases for this proposition. First, *Alden v. Maine*: "The second important limit to the principle of sovereign immunity is that it bars suits against States but not lesser entities. The immunity does not extend to suits prosecuted against a municipal corporation or other governmental entity which is not an arm of the State." 527 U.S. 706, 756 (1999). This sentence means one of two things: either (1) that Eleventh Amendment immunity does not extend to municipal corporations because they are not arms of the state or (2) that Eleventh Amendment immunity does not extend to a municipal corporation unless it is acting, in a particular circumstance, as an arm of the state. *Alden* in turn cites *Mt. Healthy*, in which the Court considered whether "the Mt. Healthy Board of Education is to be treated as an arm of the State partaking of the State's Eleventh

---

**[5]** At least one circuit has relied on this language and held that counties might be entitled to Eleventh Amendment immunity. *See Fuesting v. Lafayette Par. Bayou Vermilion Dist.*, 470 F.3d 576, 579 (5th Cir. 2006) ("[A] municipality can be immune from suit if it was 'acting as an arm of the State, as delineated by [the Supreme] Court's precedent'" (alteration in original) (quoting *Chatham*, 547 U.S. at 194)). But, to our knowledge, no court has ever actually extended Eleventh Amendment immunity to a county.

Amendment immunity, or is instead to be treated as a municipal corporation or other political subdivision to which the Eleventh Amendment does not extend." *Mt. Healthy*, 429 U.S. at 280. That citation suggests the former reading.

The *Chatham* Court also cited *Lake Country Estates*, but while that case noted that "some agencies exercising state power have been permitted to invoke the [Eleventh] Amendment in order to protect the state treasury from liability that would have had essentially the same practical consequences as a judgment against the State itself," it also stated that "the Court has consistently refused to construe the Amendment to afford protection to political subdivisions such as counties and municipalities, even though such entities exercise a 'slice of state power.'" *Lake Country Estates*, 440 U.S. at 400–01. Although these passages seem to support Plaintiffs' argument that counties never enjoy Eleventh Amendment immunity, it is not for us to clarify *Chatham*'s apparently contrary statement.

The *Chatham* Court ultimately found it dispositive that the County there had conceded below that it had no Eleventh Amendment immunity and that the question on which certiorari was granted assumed that conclusion. Given that the Supreme Court appears to have left open the possibility that a county could be entitled to Eleventh Amendment immunity in some cases, we decline to hold to the contrary. We therefore assume without deciding that, consistent with the Court's language in *Chatham*, a county might be entitled to Eleventh Amendment immunity if acting as an arm of the state.

### 1. The County is not an arm of the State here.

In *Mitchell*, we set out five factors for determining whether a government entity is an arm of its state for

Eleventh Amendment immunity purposes: (1) "whether a money judgment would be satisfied out of state funds"; (2) "whether the entity performs central governmental functions"; (3) "whether the entity may sue or be sued"; (4) "whether the entity has the power to take property in its own name or only the name of the state"; and (5) "the corporate status of the entity." 861 F.2d at 201. "To determine these factors, the court looks to the way state law treats the entity." *Id.*

### a.   First *Mitchell* factor

"The first *Mitchell* factor—whether a money judgment . . . would be satisfied out of state funds—is the most important." *Sato v. Orange Cty. Dep't of Educ.*, 861 F.3d 923, 929 (9th Cir. 2017); *see also Beentjes v. Placer Cty. Air Pollution Control Dist.*, 397 F.3d 775, 785 (9th Cir. 2005) (noting that the first *Mitchell* factor is "the one given the most weight"). The County conceded, both below and on appeal, that it cannot show that a money judgment would be paid directly with State funds.**[6]** Thus, this factor weighs against Eleventh Amendment immunity.

### b.   Second *Mitchell* factor

As to the second *Mitchell* factor—whether the County performs central governmental functions—we must determine whether the County addresses "a matter of statewide rather than local or municipal concern, and the extent to which the state exercises centralized governmental control over the entity." *Beentjes*, 397 F.3d at 782 (internal

---

**[6]** The parties discuss at length how the County and the State allocate the costs of the program, but that is not relevant—what matters is who would be responsible for satisfying a money judgment against the County, not who pays for the program.

quotation marks omitted) (first quoting *Belanger v. Madera Unified Sch. Dist.*, 963 F.2d 248, 253 (9th Cir. 1992); then quoting *Savage v. Glendale Union High Sch., Dist. No. 205, Maricopa Cty.*, 343 F.3d 1036, 1044 (9th Cir. 2003)).

To begin, it is unclear whether the second *Mitchell* factor concerns whether the County performs central government functions in general or whether the County performs central government functions in carrying out the particular function at issue—here implementing the IHSS program.

As the district court correctly noted, the closest analogue in our case law is *Streit v. County of Los Angeles*, 236 F.3d 552 (9th Cir. 2001). There, the Los Angeles County Sheriff's Department (LASD) would check its systems, before releasing a prisoner, to see if the prisoner was wanted by another law enforcement agency. *Id.* at 556. This extended the period of incarceration one or two days past the prisoners' release dates. *Id.* The plaintiffs alleged that the County delayed their release during these checks, in violation of their civil rights. *Id.* The LASD argued that because it was an arm of the state, it was not a "person" that could be liable for damages under § 1983. *Id.* at 557.

We looked at the LASD's performance of the particular function at issue—implementing the pre-release policy—not the LASD's general function as a sheriff's department. *See id.* at 567. We held that "*conducting the AJIS checks* is not a central government function." *Id.* (emphasis added). Thus, it appears from *Streit* that we look to whether the County, in performing the particular function at issue, performs a central government function. This fits with the Court's statement in *Chatham* that the county there might have been entitled to Eleventh Amendment immunity if it were "acting as an arm of the State, as delineated by this

Court's precedents, *in operating [a] drawbridge*." *Chatham*, 547 U.S. at 194 (emphasis added).

### i. A matter of statewide rather than local or municipal concern

The in-home care of the elderly and disabled is a matter of both statewide and local concern. Plaintiffs are residents of California, and the IHSS program is a statewide program implemented through State legislation that provides care to hundreds of thousands of California residents. But Plaintiffs are also, of course, residents of Los Angeles County, and the County has an interest in the program and the care provided in Los Angeles.

### ii. The extent to which the state exercises centralized governmental control over the entity

Here we consider the extent to which the County, in implementing the program, has "discretionary powers" and "substantial autonomy in carrying out [its] duties." *Beentjes*, 397 F.3d at 783.

The County may negotiate, implement, and pay for pay raises. *See* Cal. Welf. & Inst. Code § 12306.1. The County may also allow its providers to exceed the maximum number of hours that the CDSS has set. *See id.* § 12300.4(d)(3). Thus, the County has discretion to make some important choices on its own.

But the County contends—and Plaintiffs do not dispute—that it has no discretion over the action (or inaction) that subjected it to potential liability here: payment of overtime wages under the FLSA. In taking the actions that have subjected it to potential liability, the County had

neither "discretionary powers" nor "substantial autonomy" in carrying out its duties.

We think this clearly tips the scales in the County's favor as to this factor. The County had no choice in the matter of the overtime wages, as the State mandated the payment start date. We therefore hold that the second *Mitchell* factor favors Eleventh Amendment immunity.

### c. Third, fourth, and fifth *Mitchell* factors

The County does not dispute that it can sue and be sued (third *Mitchell* factor), that it has the power to take property in its own name (fourth *Mitchell* factor), or that it has an independent corporate status[7] separate from the State (fifth *Mitchell* factor). Thus, these three *Mitchell* factors weigh against Eleventh Amendment immunity.

\* \* \*

In sum, the first *Mitchell* factor is the most important, and it weighs against Eleventh Amendment immunity. So do the third, fourth, and fifth *Mitchell* factors. Only the second factor favors immunity. We therefore hold that, under *Mitchell*, the County is not an arm of the State when it

---

[7] The fifth *Mitchell* factor asks whether the entity has "independent corporate status," *Holz v. Nenana City Pub. Sch. Dist.*, 347 F.3d 1176, 1188 (9th Cir. 2003), or is, instead, merely an agency of the state without an identity that is separate from the state, *Beentjes*, 397 F.3d at 785. Here the County does not dispute its independent corporate status, as the Supreme Court has already held that California counties have independent corporate status and are not agents of the State of California. *See Moor v. Alameda Cty.*, 411 U.S. 693, 719 (1973).

administers the IHSS program, and thus it has no Eleventh Amendment immunity barring this action.

## 2. The Supreme Court has not overruled or undermined *Mitchell*.

The County argues that we should overrule *Mitchell* because a later Supreme Court case, *Hess v. Port Authority Trans-Hudson Corporation*, 513 U.S. 30 (1994), undermined it. As a three-judge panel, if we find that intervening Supreme Court authority is clearly irreconcilable with our own precedent, we must consider ourselves bound by the intervening higher authority and consider our precedent effectively overruled. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003). Because *Hess* is not clearly irreconcilable with *Mitchell*, we reject the County's argument.

In *Hess*, the Court held that a Congressionally approved bistate entity—the Port Authority Trans-Hudson Corporation (PATH), created to improve coordination of the "terminal, transportation and other facilities of commerce in, about and through the port of New York"—did not have Eleventh Amendment immunity. 513 U.S at 35, 52–53 (citation omitted). The County argues that *Hess* established "indicators of immunity" that undermine the *Mitchell* test. We disagree.

The *Hess* Court noted that "current Eleventh Amendment jurisprudence emphasizes the integrity retained by each State in our federal system." *Id.* at 39. The Court then emphasized the difference between PATH and the States of the Union: "The States, as separate sovereigns, are the constituent elements of the Union. Bistate entities, in contrast, typically are creations of three discrete sovereigns: two States and the Federal Government." *Id.* at 40.

The Court stated that "[p]ointing away from Eleventh Amendment immunity, the States lack financial responsibility" for the bistate entity. *Id.* at 45. Here, California similarly lacks financial responsibility for the County generally, but Plaintiffs allege that although California writes their checks, the County pays a share of their wages and sets their hours of work.

In *Hess*, "indicators of immunity point[ed] in different directions." *Id.* at 47. Perhaps they do here as well. Los Angeles is not a constituent member of the Union, but it acted at the direction of the State and had no authority over the payments at issue. But when faced with a different dichotomy in *Hess*, the Court emphasized that the most important factor was whether judgments against PATH would be paid by the State: "the vulnerability of the State's purse [is] the most salient factor in Eleventh Amendment determinations." *Id.* at 48; *see also id.* at 48–49 (citing cases for the "prevailing view" that the state-treasury factor is "generally accorded . . . dispositive weight"); *id.* at 51 (stating that "the Eleventh Amendment's core concern is not implicated" if the State is not "in fact obligated to bear and pay the . . . indebtedness of the enterprise").[8]

---

[8] The dissent read the holding even more broadly:

In place of the various factors recognized in *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 99 S. Ct. 1171, 59 L.Ed.2d 401 (1979), for determining arm-of-the-state status, we may now substitute a single overriding criterion, vulnerability of the state treasury. If a State does not fund judgments against an entity, that entity is not

After noting that the bistate entity "was financially self-sufficient," generated "its own revenues," and paid "its own debts," the Court held that "[r]equiring the [bistate entity] to answer in federal court to injured railroad workers who assert a federal statutory right, under the FELA, to recover damages does not touch the concerns—the States' solvency and dignity—that underpin the Eleventh Amendment." *Id.* at 52. The same is true here. *Mitchell* and *Hess* both emphasize the state-treasury factor. *Hess* thus fully supports and does not undermine *Mitchell*.[9]

The County argues that *Hess* emphasized the amount of control that a state maintains over an entity, a factor supposedly not mentioned in *Mitchell* and one that, according to the County, favors Eleventh Amendment immunity here. First, as we mentioned above, the second *Mitchell* factor *does* include a "control" inquiry—it just doesn't make that factor dispositive. In addition, *Hess* pointed out that "[g]auging actual control . . . can be a 'perilous inquiry,' [and] 'an uncertain and unreliable exercise.'" 513 U.S. at 47 (quoting Note, 92 Colum. L. Rev. 1243, 1284 (1992)). The Court therefore doubted not only the efficacy but also the utility of a "control" analysis, and it

---

within the ambit of the Eleventh Amendment, and suits in federal court may proceed unimpeded.

*Id.* at 55 (O'Connor, J., dissenting).

[9] Los Angeles makes a legitimate point about the unfairness of the result here. But that unfairness springs from the State and its implementing legislation, not the Eleventh Amendment. Los Angeles must air its grievance, if at all, in Sacramento.

did not suggest that control was a favored, much less dispositive, factor in the Eleventh Amendment analysis.[10]

*Hess* clearly stated that "rendering control dispositive does not home in on the impetus for the Eleventh Amendment: the prevention of federal-court judgments that must be paid out of a State's treasury." *Id.* at 48. And, in specifically discussing the control factor, the Court noted that even though "'political subdivisions exist solely at the whim and behest of their State,' . . . cities and counties do not enjoy Eleventh Amendment immunity." *Id.* at 47 (quoting *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 313 (1990)).

Finally, the County insists that *Hess* compels us to consider the State's dignity, a factor not mentioned in *Mitchell*. *Hess* noted that the State's "solvency and dignity . . . underpin the Eleventh Amendment." 513 U.S. at 52. That is undoubtedly true. But the State is no longer a party to this action, and it will not be responsible for an adverse judgment against the County. Allowing this action against Los Angeles does not injure California's dignity.[11]

---

[10] The control discussed in *Hess* seems to have gone to *overall* control over the entity, not just control within the context of the particular function at issue: "PATH urges that we find good reason to classify the Port Authority as a state agency for Eleventh Amendment purposes based on the control New York and New Jersey wield over the Authority. . . . But ultimate control of every state-created entity resides with the State, for the State may destroy or reshape any unit it creates." *Id.* at 47. Thus, looking at the State's overall control over the County as a county would not help the County's position here.

[11] And, although it would not have altered our analysis, we note that California has not sought to file an amicus brief (below or on appeal)

The Supreme Court decided *Hess* about five years after we decided *Mitchell*.  And although *Hess* arose in a different context than *Mitchell-Hess* addressed a bistate entity, not a county—nothing in *Hess* so undermines *Mitchell* that we have the power to overrule it.  More importantly, even if we used *Hess* rather than *Mitchell* to guide our analysis, we would reach the same result.

When a non-state entity invokes Eleventh Amendment immunity, the most important factor for determining whether the entity is an arm of the state remains the state-treasury factor—that is, whether the state will be liable for a money judgment against the non-state entity.  That factor, and all but one of the other *Mitchell* factors, dictates the result here.  The Eleventh Amendment does not bar Plaintiffs' suit against Los Angeles.

**B.  The effective date of the rule is January 1, 2015.**

We next consider whether the effective date of the rule is the original effective date of January 1, 2015 or some date after the D.C. Circuit reversed the district court's vacatur. The County argues that the rule cannot have an effective date that is earlier than the date on which the D.C. Circuit reversed the district court's vacatur.  Plaintiffs argue that the legal effect of the vacatur is to reinstate the original January 1, 2015 effective date.  We agree with Plaintiffs and hold that the effective date of the rule is January 1, 2015.

---

arguing either that the County is entitled to Eleventh Amendment immunity or that this case threatens California's dignity.

**1. A January 1, 2015 effective date is not impermissibly retroactive.**

The County argues that a January 1, 2015 effective date is impermissibly retroactive. Plaintiffs argue that the D.C. Circuit's decision, not the rule, applies retroactively, because the D.C. Circuit was "explaining what the law always was," and thus reinstating the original effective date is merely a return to the status quo ante.

When an appellate court applies "a rule of federal law to the parties before it," that interpretation "must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate [the] announcement of the rule." *Harper v. Va. Dep't of Taxation*, 509 U.S. 86, 97 (1993). That is because "when a court delivers a ruling, even if it is unforeseen, the law has not changed. Rather, the court is explaining what the law always was." *Jones Stevedoring Co. v. Dir., Office of Workers' Comp. Programs*, 133 F.3d 683, 688 (9th Cir. 1997).

When the D.C. Circuit held that the DOL had the rulemaking authority to promulgate the new rule and that its new rule was a reasonable exercise of that authority, *see Weil II*, 799 F.3d at 1090, it did not change the law but merely explained what the law always was—the district court's erroneous contrary holding notwithstanding.

Two cases support our holding. In *GTE South, Inc. v. Morrison*, 199 F.3d 733, 738, 740 (4th Cir. 1999), the Fourth Circuit addressed an issue much like the one we face: determining the effective date of certain pricing rules, promulgated by the FCC, that the Eighth Circuit stayed and then vacated before their effective date. The Supreme Court later reversed the Eighth Circuit. *See AT & T Corp. v. Iowa*

*Utilities Bd.*, 525 U.S. 366, 385 (1999).  The *Morrison* panel held that "the Supreme Court's determination that the FCC has jurisdiction to issue pricing rules would appear to compel the conclusion that the FCC always had such jurisdiction and that the rules *apply as of the effective date originally scheduled.*"  199 F.3d at 740 (emphasis added). The Fourth Circuit emphasized that its holding was not unfair to the parties who argued for a later effective date because they had "ample notice" of the original effective date and "surely knew that the FCC's authority to issue pricing rules might ultimately be upheld by the Supreme Court." *Id.* at 741.

In *US West Communication, Inc. v. Jennings*, 304 F.3d 950, 955 (9th Cir. 2002), we considered a similar question: whether the regulations that the Fourth Circuit considered in *Morrison* applied to conduct that occurred during the period of vacatur.  Finding the Fourth Circuit's reasoning in *Morrison* persuasive and applicable, we noted that the Supreme Court's determination that the regulations were valid meant that we should apply them "to all . . . agreements arbitrated under the Act, *including agreements arbitrated before the rules were reinstated.*"  *Id.* at 957 (emphasis added).  Relying on *Morrison*, we held that applying the reinstated regulations to conduct that occurred during the period of vacatur would not give the regulations an impermissible retroactive effect.  *Id.* at 958.

*Morrison* and *Jennings* are analogous to this case because both involved determining how to apply rules or regulations that were vacated but ultimately reinstated on appeal.  Indeed, *Morrison* commented not only on the retroactivity of the Supreme Court's reversal but also on the effective date of the regulations, holding that the intervening

vacatur did not alter the original effective date of the pricing rules.  199 F.3d at 740.

Thus, *Morrison* and *Jennings* guide our analysis here. The D.C. Circuit's holding that the DOL had the authority to promulgate the new rule and that the rule was reasonable applies retroactively.  As in *Jennings*, the regulations apply as of the original effective date.  To hold otherwise could encourage dilatory appellate litigation.  If an erroneously vacated rule or regulation were not effective until sometime after the mandate issued in a later appeal, then a party might drag out the appellate process to avoid compliance for as long as possible.  Put differently, an erroneous vacatur cannot postpone a rule's effective date until an appellate court corrects the error sometime in the future.  And, as the Fourth Circuit noted in *Morrison*, in a case like this everyone knows that the lower court decision might be reversed on appeal.

The State and its counties knew from October 13, 2013, when the DOL first announced its final rule, that January 1, 2015 was the rule's effective date.  *See* Application of the Fair Labor Standards Act to Domestic Service, 78 Fed. Reg. at 60,454.  The State and its counties had a full fifteen months to comply with the final rule—indeed the State initially said that it would comply with the original effective date, but it changed course after the *Weil I* court vacated the rule.  That decision may have been reasonable, but it created a monetary risk, as the State and its counties were well aware that an appellate court might uphold the regulations on appeal.

The district court held that to apply the *Weil II* decision retroactively would be to "reinstate[] an earlier and judicially vacated effective date and retroactively creat[e] liability for violations of the reinstated regulations as if the District

Court's vacation of the regulations had never occurred." That is exactly correct. And although the district court found that to be unfair, it would be equally unfair to hold that a putative collective of homecare providers is not entitled to nearly a year's worth of overtime wages just because a single district court issued an erroneous decision that another court reversed on appeal. The State gambled that *Weil I* would be affirmed. The effect of that gamble might be unfair to the County, but the County must seek any recourse from the State. It is not fair for the homecare providers to bear the financial consequences of the State's calculated risk.

**2. The DOL's decision not to enforce a new rule does not obviate private rights of action.**

According to the County, the DOL's choice against enforcing the rule until November 12, 2015 eliminated the availability of private rights of action until that date because a private right of action cannot precede an agency's enforcement of a rule or regulation. We disagree.

"An agency's informal assurance that *it* will not pursue enforcement cannot preclude a citizen's suit to do so." *Ohio Valley Envtl. Coal. v. Fola Coal Co., LLC*, 845 F.3d 133, 145 (4th Cir. 2017) (emphasis added). Congress created a private right of action under the FLSA for unpaid overtime: "Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their . . . unpaid overtime compensation . . . ." 29 U.S.C. § 216(b). An agency's discretionary decision to hold off enforcement does not and cannot strip private parties of their rights to do so. *See Ohio Valley*, 845 F.3d at 145 ("Congress enacted the citizen suit provision of the Clean Water Act to address situations, like the one at hand, in which the traditional enforcement agency declines to act.").

The district court's hypothesis that the D.C. Circuit and DOL "intended" that the regulation become effective "no earlier than November 12, 2015" is tenuous and, in any event, irrelevant. First, the D.C. Circuit said nothing at all on the issue. Second, there is nothing in the several statements of the DOL, which the district court relied on, that suggest that it intended its discretionary enforcement choices to preclude private enforcement. Indeed, other than by amending the rule, the DOL could not have precluded private enforcement even if it wanted to.

The rule's original effective date remains January 1, 2015. If the DOL "intended" for the effective date be something other than January 1, 2015, the DOL could have sought to change that effective date through the procedures set out in the Administrative Procedure Act. Were we to hold to the contrary and impose our view that the DOL's exercise of discretion amended the effective date sub silentio, we would in fact be usurping the rulemaking authority of the DOL. *See Nat. Res. Def. Council, Inc. v. U.S. E.P.A.*, 683 F.2d 752, 762 (3d Cir. 1982) (holding that a final rule's effective date is an "essential part" of that rule and is thus subject to the rulemaking procedures of the APA).

The effective date of the rule is January 1, 2015.[12]

---

[12] Although some district courts have reached a different conclusion—*see, e.g.*, *Bangoy v. Total Homecare Solutions, LLC*, No. 1:15-CV-573, 2015 WL 12672727, at *3 (S.D. Ohio Dec. 21, 2015) (holding that the plaintiffs failed to state a claim for a violation of the FLSA between January 1, 2015 and "late August 2015")—nearly all of them have reached the same result we reach here, *see, e.g.*, *Kinkead v. Humana, Inc.*, 206 F. Supp. 3d 751, 752 (D. Conn. 2016) (holding that the effective date of the rule is January 1, 2015, "the effective date set

## CONCLUSION

We **AFFIRM** the district court's holding that the County is not entitled to Eleventh Amendment immunity and **REVERSE** the district court's holding that the putative collective period began on November 12, 2015, holding instead that the rule's effective date—and thus the beginning of the putative collective period—is January 1, 2015. We **REMAND** for proceedings consistent with this opinion. Costs shall be awarded to Plaintiffs-Appellants.

forth by the agency"); *Collins v. DKL Ventures, LLC*, 215 F. Supp. 3d 1059 (D. Colo. 2016) (same); *Lewis-Ramsey v. Evangelical Lutheran Good Samaritan Soc'y*, 215 F. Supp. 3d 805 (S.D. Iowa 2016) (same).